STATE OF CONNECTICUT *v.* WALLACE JOYCE
(9896)

DALY, O'CONNELL and HEIMAN, Js.

Argued September 14, 1992—decision released January 26, 1993

*John R. Williams,* for the appellant (defendant).

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Michael A. Pepper,* assistant state's attorney, for the appellee (state).

O'CONNELL, J. The defendant appeals from the judgment of conviction, after a jury trial, of arson in the first degree in violation of General Statutes § 53a-111 (a) (4).[1] The defendant claims that (1) the trial court improperly denied his motion to suppress the results of a test performed on his clothing, (2) the trial court improperly refused to admit evidence implicating a third party as the perpetrator, and (3) there was insufficient evidence to support his conviction. We affirm the judgment of the trial court.

[1] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and . . . (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury."

The jury could reasonably have found the following facts. At approximately 4 p.m. on January 29, 1990, the defendant was severely burned in an explosion and fire at a house formerly owned by his father.[2] A neighbor described a "whooshing sound" and an "orangey glow" in the house followed seconds later by the defendant in flames running out of the front door. The defendant then ran down an embankment and jumped into a nearby river. The neighbor observed that the defendant's face was "all burned," his pant leg was ripped open and his hands were so badly burned that they appeared as if "he almost had gloves on."[3]

The East Haven fire department arrived shortly thereafter and one of the firefighters, who was also a trained paramedic, observed the defendant standing waist deep in the river. The firefighter, Charles Licata, helped him out of the water and noticed that he had severe burns over a large portion of his body.[4] At the suppression hearing, Licata described the defendant's clothing as charred and "mostly burned off his body in all the areas where he had the third and second degree burns." Licata also remarked that the defendant's clothes were still smoldering and warm to the touch.

To facilitate treatment, Licata cut off all of the defendant's clothing.[5] What remained of the clothing

---

[2] Approximately nine months prior to the fire, the defendant's father had died, leaving a life tenancy in the house to one of the defendant's sisters and the defendant's nephew.

[3] Other testimony explained that the appearance of the defendant's hands, caused by the skin hanging off them, is known as "degloving."

[4] The firefighter's report indicated that the defendant had second and third degree burns over 30 to 40 percent of his body. Later testimony indicated that 42 percent of his body was burned.

[5] At the hearing on the motion to suppress, Licata explained the necessity for removing the clothing: "He had open blisters from the third degree burns on most of his body and the burnt clothing was beginning to stick to them from the char. And for reasons of infection, we don't want any

was then left in a wet pile on the roadside.[6] Licata testified that the defendant did not resist treatment. After approximately ten or fifteen minutes of emergency treatment at the scene, the defendant was taken to the hospital by ambulance. A detective secured the defendant's clothing and wallet from the roadside, placed them in the trunk of his car, and brought them to the East Haven police department. The detective testified that he took them "[a]s a safekeeping process so they wouldn't be stolen or lost." The police did not consider the defendant to be a suspect at that time. At the police station, the clothes were hung to dry.

Later the same day, due to some concern that the defendant might be close to death, a police detective questioned him at the hospital. The detective explained that the questioning was initiated because "we didn't know who he was and to find out what transpired at the fire scene." The defendant was coherent and responsive to the detective's questioning. The detective also spoke to the defendant's wife and advised her that she could come to the station house and retrieve the clothing. Although his wallet was returned the next day, neither the defendant nor his wife made any attempt to retrieve the clothing in the several months between the time of the fire and the trial.

The state claims, as a result of ongoing investigation, that by the day after the fire the police had probable cause to believe that it had been started by the defendant. At that time, the clothing was transported to the state forensic laboratory in Meriden for analysis. Gas chromatography revealed the presence of either gaso-

---

of the dirty water from the lake, the river that he was standing in, to start infecting everything because everything was wide open for infection at that time."

[6] After observing the clothing at the hearing on the motion to suppress, the court stated: "The court's view is that the clothing was torn, unusable and that the court believes is a factor to consider."

line or a petroleum distillate similar to gasoline on some of the clothing. Thereafter, the clothing was returned to the East Haven police department.

After an extended period of hospitalization, the defendant was charged with one count of arson in the first degree under General Statutes § 53a-111 (a) (3) and one count under § 53a-111 (a) (4). He was tried before a jury in November, 1990, and acquitted on the first charge but convicted on the second.

Additional facts will be set forth where they are relevant to each issue.

I

The defendant first claims that the test performed on his clothing constituted an illegal search and seizure in violation of the fourth amendment to the United States constitution[7] and article first, § 7, of the Connecticut constitution.[8]

We start by recognizing that the first clause of the fourth amendment protects two different types of expectations: freedom from unreasonable searches and freedom from unreasonable seizures. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Horton* v. *California,* 496 U.S. 128, 133, 110

---

[7] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[8] We note that the defendant has not provided any separate or distinct argument under the state constitution. As a result, this court need not independently undertake to engage in such an analysis. *State* v. *Birch,* 219 Conn. 743, 746 n.4, 594 A.2d 972 (1991); *State* v. *Johnson,* 28 Conn. App. 708, 713, 613 A.2d 1344, cert. granted, 224 Conn. 911, 617 A.2d 168 (1992).

S. Ct. 2301, 110 L. Ed. 2d 112 (1990); *United States* v. *Jacobsen,* 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). Accordingly, the two concepts must be analyzed separately.

## A

We first analyze the defendant's claim that his clothes were illegally seized. He does not appear to contend that the manner in which the clothes initially came into police custody was unconstitutional. The clothing was taken from the scene to protect it from possible loss or theft. Federal and state law both recognize that the police have a caretaking function relating to property exposed to possible loss, damage or theft. *Cady* v. *Dombrowski,* 413 U.S. 433, 441, 93 S. Ct. 2535, 37 L. Ed. 2d 706 (1973); *State* v. *Tully,* 166 Conn. 126, 136–38, 348 A.2d 603 (1974).

The defendant contends that the illegal seizure occurred at the moment the clothes were transferred to the police laboratory for analysis. The gravamen of his argument is that, although the police needed no warrant when the clothing was drying in the detective division or when it was transferred to another area for storage, they did need a warrant to transfer the clothing temporarily to the laboratory.

By analogy to the cases dealing with seizure of persons, the clothing could not be considered seized absent some indication that the police, by a show of authority, restricted the defendant's right to exercise his dominion and control over it. See *United States* v. *Jacobsen,* supra; *United States* v. *Mendenhall,* 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). There is no indication in the record that transferring the defendant's clothing to the laboratory provided any additional interference with the defendant's possessory interest. There is no evidence that the defendant was denied access to the clothing either before, during or

after the testing. Indeed, neither he nor his family made any attempt to retrieve the clothing, although they were free to do so at any time.[9]

The defendant's theory would mean that, whenever property is lawfully in the possession of the police, a seizure would arise each time something happens to that property thereby requiring a new warrant. For example, if the police legally seized a pistol during a search incident to an arrest, the pistol could not be taken to the police shooting range and fired for a ballistic test without a warrant being issued. According to the defendant's argument, the transporting and firing of the pistol would constitute an additional and distinct seizure. We are not persuaded that the unwieldy burden placed on the police and the courts by this theory is justified by any concomitant benefit to the owner of the property.[10]

## B

Notwithstanding the absence of an illegal seizure, we proceed with our analysis to determine whether the scientific examination of the clothes constituted a search. In order to take advantage of the constitutional protection against unreasonable searches, the defendant has the burden of showing that he had a reasonable expectation of privacy in the item searched and that his expectation was one that society would recognize as reasonable. *Rawlings* v. *Kentucky,* 448 U.S. 98,

[9] At oral argument, defendant's counsel claimed that after the testing it was too late for possession of the clothing to be meaningful to him because the damaging evidence had already been secured by the testing. We do not agree. The clothes still may have been valuable to him for purposes of his own testing to counter the results of the state's examination.

[10] The dissent relies, in part, on *Cady* v. *Dombrowski,* 413 U.S. 433, 93 S. Ct. 2535, 37 L. Ed. 2d 706 (1973), and *State* v. *Tully,* 166 Conn. 126, 348 A.2d 603 (1974), for the proposition that the transfer of the defendant's clothing to the laboratory constituted an unlawful seizure. Neither case, however, holds that property, *already* lawfully in police custody pursuant to the police caretaking function, cannot be moved without a warrant.

104–105, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980); *State* v. *Pittman,* 209 Conn. 596, 601, 553 A.2d 155 (1989). We emphasize that although the burden is on the state to prove that a search falls within an exception to the warrant requirement; *State* v. *Badgett,* 200 Conn. 412, 424, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); it is the defendant who must show that he had an actual subjective expectation of privacy. *Rawlings* v. *Kentucky,* supra, 104; *Katz* v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring); *State* v. *Brown,* 198 Conn. 348, 356, 503 A.2d 566 (1986).

Whether the defendant has established a reasonable expectation of privacy is determined on a case by case basis; *State* v. *Mooney,* 218 Conn. 85, 94, 588 A.2d 145, cert. denied, U.S. , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); by a factual inquiry into all of the relevant circumstances. *State* v. *Reddick,* 207 Conn. 323, 331, 541 A.2d 1209 (1988). The trial court's finding that the defendant had no reasonable expectation of privacy in the clothing may not be overturned on appeal "unless it is legally or logically inconsistent with the facts found or involves an erroneous rule of law." *State* v. *Pittman,* supra.

Although often referred to as a subjective expectation of privacy, the defendant must demonstrate an *"exhibition* of an actual expectation of privacy." (Emphasis in original.) *United States* v. *Taborda,* 635 F.2d 131, 137 (2d Cir. 1980); *California* v. *Greenwood,* 486 U.S. 35, 39, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988); *Katz* v. *United States* supra, 361; 1 W. LaFave, Search and Seizure (2d Ed. 1987) § 2.1 (b), pp. 308–309. Mere ownership of property while it is in the custody of the police does not demonstrate a reasonable expectation of privacy. "[I]t is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in

the object." (Internal quotation marks omitted). *State v. Mooney,* supra, 107, quoting *United States* v. *Thomas,* 864 F.2d 843, 845 (D.C. Cir. 1989).[11] The constitution protects what one "seeks to preserve as private." *Katz* v. *United States,* supra, 351.

We recognize, generally, that there is a reasonable expectation of privacy in clothing. The singular facts of this case demonstrate, however, that any reasonable expectation of privacy the defendant may have had in his clothing prior to the fire had diminished after the fire to a point beyond the shelter of the fourth amendment. First, the defendant failed to exhibit any expectation of privacy in his clothing after the police took it into custody for safekeeping. Such an exhibition is a sine qua non to successfully invoking the protection of the fourth amendment.[12] Neither the defendant nor anyone on his behalf requested the return of the clothing nor in any other way contacted the police in relation to it. Second, the clothing was burned and torn to the extent that, in the view of the trial court, it was no longer usable as clothing.[13] Third, the clothing was

[11] The quotation from *State* v. *Mooney,* 218 Conn. 85, 107, 588 A.2d 145 (1991), refers to abandonment of property. The state does not claim abandonment in the present case but the quotation is relevant to the privacy issue.

[12] The dissent relegates the reasonable expectation requirement to a footnote, notwithstanding the fact that it is at the core of the case. The dissent views the court's opinion on this point to be "Orwellian" and "disingenuous" because the defendant's smoldering clothing was removed by a firefighter and not by himself. The dissent further reasons that the defendant could not have exhibited an expectation of privacy while "he clung to life at the hospital." Although the defendant's failure to request his clothing is only one factor in our reasonable expectation analysis, a note of clarification is necessary. First, we see no reason why an expectation of privacy would exist if the defendant had removed his clothing, but would not exist because a firefighter came to his rescue and peeled the smoldering remains of the clothing off his body. Second, the defendant did not have to exhibit an expectation of privacy *only* immediately after the fire in order to have it suppressed several months later at the time of trial. There was ample opportunity for such an exhibition before the defendant moved to suppress the clothing.

[13] See footnote 6, supra.

■■■■■■

removed without resistance from the defendant as a lifesaving measure and then left in a pile on a public street where it was lawfully secured and held by the police. In that situation, an erosion of privacy is inevitable. See, e.g., *Wagner* v. *Hedrick,* 383 S.E.2d 286 (W. Va. 1989) (accident victim taken to hospital emergency room had no reasonable expectation of privacy in his removed clothing because the area was freely accessible to police officers and others); *State* v. *Smith,* 88 Wash. 2d 127, 559 P.2d 970, cert. denied, 434 U.S. 876, 98 S. Ct. 226, 54 L. Ed. 2d 155 (1977) (defendant in hospital had no reasonable expectation of privacy in his clothing because it was in a semipublic area and hospital had control of the clothes).

As a result, the trial court's finding that the defendant had no reasonable expectation of privacy in his clothing was adequately supported by the evidence.[14]

Assuming arguendo that there had been a seizure and that the defendant had demonstrated an expectation of privacy, we next consider whether the laboratory examination of the clothes constituted a search. The state argues that the limited nature of the testing does not make it a search within the meaning of the fourth amendment. In numerous cases, the courts have held that various minimally intrusive examinations were not unreasonable constitutional searches. *United States* v. *Jacobsen,* supra (no search in field test for cocaine); *United States* v. *Place,* 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) (no search in uncovering drugs through a canine sniff); *United States* v. *Williams,* 902 F.2d 678, 680 (8th Cir. 1990) (no search in use of ultraviolet light to detect residue).

[14] We do not reach the second prong of the privacy test—that the expectation of privacy was one that society would recognize as reasonable. The defendant's brief does not address the expectation of privacy issue.

In *United States* v. *Jacobsen,* supra, the court considered whether a field test for cocaine infringed on a legitimate expectation of privacy. In recognizing the remoteness of the possibility that chemical testing would compromise a legitimate expectation of privacy, the court held that there was no fourth amendment violation. The court explained that a "chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy." Id., 123. The reason is that such a narrowly focused test will uncover only the presence of contraband, not a "private" fact. Similarly, in the present case, the purpose of the testing was to uncover the presence of an accelerant, not a "private" fact.

Particularly relevant to this case is *State* v. *Chesney,* 166 Conn. 630, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974), in which the police, acting without a warrant, applied paraffin to the defendant's hands to determine whether they would show gunpowder residue. The defendant was not under arrest at that point but, like the defendant in the present case, was merely a suspect. The *Chesney* court held that "applying paraffin casts to the accused's hands did not violate the fourth and fifth amendments anymore than fingerprinting." Id., 640; see *State* v. *Chin Lung,* 106 Conn. 701, 723, 139 A. 91 (1927).

We conclude that the minimally intrusive examination of the remnants of the defendant's clothing to determine whether it contained an accelerant was not a search within the meaning of the fourth amendment prohibition against unreasonable searches.[15] Accord-

[15] The dissent asserts that the state "conceded during oral argument that a warrantless search had in fact occurred." We do not discern, in the state's remark, an abandonment of the state's briefed position that there was no search in violation of the fourth amendment. Indeed, shortly after counsel acknowledged that there was a search, he proceeded to argue, citing *United States* v. *Jacobsen,* 466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984),

ingly, the trial court correctly denied the defendant's motion to suppress the results of the analysis of the defendant's clothing.

## II

The defendant next claims that his state and federal due process rights were violated when the trial court refused to admit evidence concerning the culpability of David Thomas in the arson. The defendant's theory of exculpation has its genesis in the will of his father, Lawrence Joyce. The beneficiaries of the will included the defendant, his sisters, Barbara Larson, Lauren Bowers, Joan Hubbard, Judith Corso and Patricia Haroskewicz, and the defendant's nephew, David Thomas. The will provided that the defendant and his sisters were to take equal shares of the residual estate. The will also provided that one sister, Barbara Larson, and the nephew, David Thomas, were to receive a life tenancy in the house with the remainder in the residual estate.

Sometime after the death of Lawrence Joyce, Barbara Larson announced her intention to move from California to Connecticut and occupy the house. Larson's decision was apparently supported by most of the family. As a result, the defendant posits that Thomas had been effectively ousted from his life estate and could gain economic value from the will only through the destruction of the house.[16]

that the search was not illegal within the meaning of the fourth amendment. The fourth amendment does not protect against all searches, only against those that are unreasonable. *Florida* v. *Jimeno,* U.S. , 111 S. Ct. 1801, 1803, 114 L. Ed. 2d 297 (1991). Furthermore, we are not bound by comments of counsel. *State* v. *Falcon,* 26 Conn. App. 259, 265, 600 A.2d 1364, cert. denied, 221 Conn. 911, 602 A.2d 10 (1991); *State* v. *Putnoki,* 200 Conn. 208, 219 n.6, 510 A.2d 1329 (1986).

[16] The defendant offers no explanation as to why a less drastic remedy, such as partition, would not have been available to Thomas. Query as to the validity of a will provision purporting to prohibit partition.

To that end, the defendant offered evidence, out of the presence of the jury, that included the testimony of the defendant's sisters, Lauren Bowers and Joan Hubbard, as well as the testimony of Thomas. Lauren Bowers testified that when Lawrence Joyce was a patient at Yale-New Haven Hospital, she, her sister Patricia Haroskewicz, and Thomas were in the emergency room. At that time, she testified that Thomas "said to me that if there were any arguments about anything at the house, that he would burn the f_____ house down."

Thomas admitted that he made one inculpatory statement. He testified that three or four months before Lawrence Joyce's death and approximately eight months before the house burned he had said to Judy Corso, "it would be pretty hard to fight over [the contents of the house] if I burnt it to the ground."[17] He denied making a similar statement at any subsequent time. Thomas further stated that, at the time of the fire, his mother, Patricia Haroskewicz, lived about a mile from Jimmie's Savin Rock Restaurant in West Haven. The defense elicited this statement in an attempt to connect Thomas to a book of matches, labeled with the restaurant's name, that was found on the floor of the house after the fire.

Joan Hubbard testified that the night Lawrence Joyce was dying, Thomas was in the hospital room with a group of his friends. When Hubbard asked him to leave, he said "I'll TNT that God damn place." She further testified that, when Thomas' friends said to him, "You're going to trash it and torch it," Thomas responded, "I'll burn the mother f_____ down."

---

[17] There was evidence at trial of ongoing disputes among the family members concerning the disposition of the contents of the estate.

After hearing the proffered testimony and counsel's argument, the court ruled that neither the evidence attempting to link Thomas to the matchbook nor the three witnesses' testimony was admissible to exculpate the defendant. The court ruled that the evidence was insufficient to connect Thomas directly to the arson. Moreover, the court stated that "it is collateral in nature, does not sufficiently assist the jury in its task, and, accordingly, the court deems it to be irrelevant."

The admission of third party exculpatory evidence is governed by well established rules. "Both this state and other jurisdictions have recognized that a defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. . . . The defendant, however, must show some evidence which directly connects a third party to the crime with which the defendant is charged. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Internal quotation marks omitted.) *State* v. *Boles,* 223 Conn. 535, 548–49, 613 A.2d 770 (1992). "The admissibility of evidence of third party culpability is governed by the rules relating to relevancy." Id., 549.

In determining the admissibility of evidence, "[t]he trial court has broad discretion to determine both the relevancy and remoteness of evidence." *Dunham* v. *Dunham,* 204 Conn. 303, 324, 528 A.2d 1123 (1987). "Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." *State* v. *Payne,* 219 Conn. 93, 114, 591 A.2d 1246 (1991).

Furthermore, the court's determination of relevancy will ordinarily not implicate due process concerns. "Relevancy is an evidentiary question and [e]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error. . . . The defendant's rights to confront and cross-examine witnesses and to present a defense do not give him the right to have admitted any evidence he chooses. . . . In the exercise of his rights, the defendant, as well as the state, must comply with the established rules of evidence and procedure. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Boles, supra,* 550.

The trial court had the opportunity to hear the witnesses and evaluate the probative value of their testimony. In determining relevancy, "[t]he court must determine whether the proffered evidence is corroborative or coincidental, whether it is probative or tends to obfuscate, and whether it clarifies or obscures. In arriving at its conclusion, the trial court is in the best position to view the evidence in the context of the entire case, and we will not intervene unless there is a clear abuse of the court's discretion." *State* v. *Aspinall,* 6 Conn. App. 546, 554, 506 A.2d 1063 (1986). Accordingly, we limit our review "to a determination of whether, under the circumstances of the case, in exercising its broad discretion, the trial court could legally act as it did, and not whether we, under the same circumstances, would make the same ruling." Id.

Although the evidence might have presented a possible motive or ground for suspicion of Thomas, that by itself, is insufficient to establish relevancy. *State* v. *Boles, supra,* 549–50. The evidence must *directly* connect Thomas to the crime. The trial court properly exercised its discretion in concluding that the proffered evidence was either too remote or otherwise insuffi-

cient to connect Thomas directly to the crime.[18] This is particularly true where, as here, the defendant made no attempt to introduce any evidence as to Thomas' whereabouts at the time of the fire.

The trial court's ruling that the proffered evidence did not directly connect Thomas to the crime was not an abuse of discretion nor did it result in substantial prejudice to the defendant. Further, because the evidentiary ruling was properly within the court's discretion, we hold that the defendant's state and federal due process rights were not violated by the exclusion of evidence that Thomas might have committed the crime.

## III

The defendant also argues that the state failed to prove his guilt beyond a reasonable doubt. In particular, he claims that (1) the state failed to prove the identity of the defendant as the perpetrator, and (2) the state failed to prove, as required under General Statutes § 53a-111 (a) (4), that any firefighter or peace officer was subjected to a substantial risk of bodily injury. We disagree.

In reviewing a claim of insufficiency of the evidence, we employ a two part inquiry. "First, we review the evidence presented at trial, construing it in the light most favorable to sustaining the jury's verdict. Second, we determine whether, on the facts so construed and the inferences reasonably drawn therefrom, the jury could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." *State* v. *Jupin,* 26 Conn. App. 331, 337, 602 A.2d 12, cert. denied, 221 Conn. 914, 603 A.2d 404 (1992); *State*

---

[18] The parties have addressed the issue of whether the statements of the two sisters were admissible within an exception to the hearsay rule. We decline to decide that issue because our review of the record indicates that the trial court excluded the evidence solely on grounds of relevancy.

v. *Gray,* 221 Conn. 713, 720, 607 A.2d 391, cert. denied, U.S. , 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992); *State* v. *Famiglietti,* 219 Conn. 605, 609, 595 A.2d 306 (1991). "In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . Findings of fact that are consistent with guilt are afforded great deference unless they are improbable and unconvincing." (Citation omitted; internal quotation marks omitted.) *State* v. *Gray,* supra.

A

There is no dispute that the defendant was at the scene of the fire both before and after its ignition. The defendant claimed that he was at the house because his truck had broken down and he wanted to use the phone. He testified that, upon walking the approximate one quarter of a mile to the house, he noticed that the pantry window unexpectedly was open. We presume that this caused him to suspect that someone had broken into the house. He then ran to the front of the house, deactivated the burglar alarm, opened the door, hit the light switch and was immediately struck by a blast of fire. In support of that claim, the defendant presented the testimony of a retired fire marshal-fire scene analyst, who stated his belief that a faulty light switch ignited the blaze.

The state presented extensive testimony of the investigating fire marshal, Frederic Brow. He testified that, in his opinion, the fire was deliberately set and that the point of ignition was no more than one foot off the floor. He also opined that, although there were two timing devices discovered during the investigation, the fire had erupted prematurely. He further testified that the severe burning or "degloving" of the defendant's hands was consistent with the injury he would have received if his hands were "in or at the point of ignition."

The state also presented the testimony of an eyewitness, who contradicted the defendant's claim that the explosion occurred as he opened the door. The eyewitness, a neighbor who lived directly across the street, testified that he had noticed that the interior front door of the Joyce house was partially open. He continued to observe the house for two or three minutes, at which time he heard a "whooshing sound" and saw an "orangey glow" behind the front window of the house. Seconds later, the neighbor saw the defendant rush out of the front door in flames.

Moreover, there was no evidence that other persons were anywhere near the house that day. In addition, the investigating police detective and Brow testified that there were no signs of a forced entry. Nor was there any evidence that the house's burglar alarm had sounded.[19] As a result, "[t]he jury might have determined beyond a reasonable doubt that no one other than the defendant had the opportunity to start the fire." State v. Famiglietti, supra, 614.

Other testimony was also consistent with a finding of guilt beyond a reasonable doubt. Evidence was adduced that contradicted the defendant's claim that he wanted to use the phone at the house because his truck had experienced mechanical difficulties. First, the state submitted evidence that there was a pay phone located between the parking lot and the house, approximately four hundred feet from where the truck was parked. Second, several days after the fire, the truck was towed to a garage for a mechanical inspection. The service technician who conducted the inspection testified that he could find no mechanical problems and that the truck ran well.[20]

[19] The alarm system was installed by the defendant's brother-in-law, who testified that the pantry window was the only downstairs window not connected to the system.

[20] On cross-examination, the service technician agreed that the truck might behave differently under different weather conditions. At best this created a question of fact for determination by the jury.

The defendant's explanation of how his clothing had become imbrued with a gasoline type substance was also challenged. On direct examination, the defendant stated that, on the day of the fire, he had used paint thinner to clean his hands after painting a house in Clinton. On cross-examination, he testified that, although he had been doing various odd jobs at the house in Clinton, he could recall painting only sporadically during the two weeks before the fire for a total of approximately three hours. He also stated that he was using a water based paint, which requires only water for cleanup. On redirect, however, he asserted that he cleaned other brushes with paint thinner on that day to prepare them for use the following day.

Accordingly, the jury could have reasonably concluded that the cumulative effect of the evidence established that the defendant was the perpetrator.

### B

There was also sufficient evidence for the jury to have concluded that there was a risk of substantial injury to the firefighters. The first firefighter on the scene testified that when he entered the house, flames were on his right and his left and that multiple fires had started in various locations in the house. He also testified that he had found firearms in the house, thus prompting him to call the fire marshal. He further stated that after he had removed the breathing mask of his air tank, he detected a chemical odor, but could not identify it due to a sinus problem. Another firefighter testified that he observed a puddle and a gasoline can on the floor of the cellar.

When fire marshal Brow arrived and entered the house, he smelled an odor similar to that of gasoline. He continued his investigation and, upon proceeding to the basement, encountered a "heavy concentration" of gasoline odor and observed that water

seeping down from the first floor appeared to be mixed with "some petroleum product." Fearing an explosion, he ordered the firefighters to vacate the premises until the vapors could be purged. Brow also testified that he felt the fire had resulted from instantaneous ignition that consumed the entire first floor of the house in "a large flash fire." Brow's investigation revealed that the entire living room had been covered with gasoline.

The statute does not require that firefighters have actually been seriously injured. "The statute requires proof of a risk of substantial injury, not serious injury in fact." *State* v. *Famiglietti,* supra, 615. In the present case, there was ample testimony as to the severity of the fire and the risk of explosion. Indeed, the defendant himself claimed that his substantial injuries were caused by an explosion when he opened the door of the house. Accordingly, there was sufficient evidence for the jury to find, beyond a reasonable doubt, that the firefighters were exposed to a risk of substantial injury.

The judgment is affirmed.

In this opinion DALY, J., concurred.

HEIMAN, J., dissenting. I respectfully dissent. Because I believe that the police should have obtained a warrant prior to testing the defendant's clothing for traces of accelerant, I would reverse and remand this case with direction to grant the defendant's motion to suppress and order a new trial.

I agree with the court's decision with respect to the second and third issues raised on appeal by the defendant. I disagree, however, with its disposition of the first issue raised by the defendant that challenged the trial court's denial of the defendant's motion to suppress the results of a test performed on his clothing. The narrow question presented by this first issue is whether

the warrantless seizure and search of the defendant's clothing violated his rights under the fourth amendment to the United States constitution[1] and article first, § 7, of the Connecticut constitution.[2]

Although the court correctly determined that the police could lawfully protect the defendant's clothing under their caretaking function, it failed to recognize that the transportation of the clothing to the state forensic laboratory constituted an unlawful seizure.[3] Pursuant to their caretaking function, the police could lawfully possess the defendant's clothing and safeguard it from possible theft, loss or damage. *Cady* v. *Dom-*

---

[1] The fourth amendment to the United States constitution, which was made applicable to the states in *Wolf* v. *Colorado,* 338 U.S. 25, 27–28, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949), provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[3] The court correctly determined that in order to assert that his fourth amendment rights have been violated, the defendant must demonstrate that he has a reasonable expectation of privacy in his clothing and that this expectation was one that society would recognize as reasonable. *Rawlings* v. *Kentucky,* 448 U.S. 98, 104–105, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980); *State* v. *Pittman,* 209 Conn. 596, 601, 553 A.2d 155 (1989). To satisfy this requirement, the defendant would have to show that he had an actual or subjective expectation of privacy in the clothing. *Rawlings* v. *Kentucky,* supra, 104; *Katz* v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring); *State* v. *Brown,* 198 Conn. 348, 356, 503 A.2d 566 (1986). There is a somewhat disingenuous and Orwellian quality to a claim that the defendant relinquished his expectation of privacy when it was the police and medical personnel who removed the defendant's clothing. It is also circular reasoning to argue that the defendant never exhibited an expectation of privacy in that clothing. The defendant did not have to reassert his expectation of privacy in the clothing nor was it feasible for him to do so while he clung to life at the hospital.

*browski,* 413 U.S. 433, 441, 93 S. Ct. 2535, 37 L. Ed. 2d 706 (1973); *State* v. *Tully,* 166 Conn. 126, 136–38, 348 A.2d 603 (1974). This caretaking function, however, cannot be used as a ruse or as a substitute for obtaining a warrant in order to seize an item for investigatory purposes. See *Cady* v. *Dombrowski,* supra; *State* v. *Tully,* supra, 136.

The cases cited by the state supporting the warrantless seizure are distinguishable from the facts of this case. The cases cited by the state fall within two categories: those that involve defendants who were already lawfully in custody or under arrest and whose personal effects were seized and subjected to laboratory analysis; see *United States* v. *Edwards,* 415 U.S. 800, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974); and those that involve exigent circumstances. See, e.g., *Cupp* v. *Murphey,* 412 U.S. 291, 93 S. Ct. 2000, 36 L. Ed. 2d 900 (1973) (court upheld warrantless seizure of fingernail scrapings of a person who the police had probable cause to believe had strangled another, and who was not lawfully arrested and was free to leave the police station); *State* v. *Badger,* 141 Vt. 430, 446, 450 A.2d 336 (1982) (court upheld warrantless seizure of a boy's bloody sneakers by the police, who had both probable cause to believe that the sneakers were incriminating evidence and an exigent circumstance in that the boy was not under arrest and could easily have destroyed the sneakers or removed the blood from them). Once the state turned the property over to the forensic laboratory, the police shed their lawful caretaking function. A seizure occurred because there was some meaningful interference with the defendant's possessory interest in his property. See *United States* v. *Jacobsen,* 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). The seizure became one for investigative purposes and interfered with the defendant's possessory interest in the clothing. The seizure was neither supported by war-

rant nor was it within any recognized exception to the warrant requirement. The warrantless seizure for investigative purposes thus violated the fourth amendment to the United States constitution.

The court also fails to distinguish adequately a search from a seizure. "Unlike a seizure, which involves state interference with a person's possessory interest, a search constitutes state interference with a person's privacy interest. . . . Although an improper seizure can be undone by returning the seized property, privacy, once invaded, cannot be restored. Thus, the invasion of privacy occasioned by an illegal search cannot be remedied satisfactorily, even if a judge subsequently determines that the search was not supported by probable cause." (Citation omitted.) *State* v. *Miller,* 29 Conn. App. 207, 220, 614 A.2d 1229, cert. granted, 224 Conn. 914, 617 A.2d 170 (1992). I disagree with the majority's statement that no search occurred[4] and that, even if a search had occurred, subsequent to the testing the defendant's clothing "still may have been valuable to him for purposes of his own testing to counter the results of the state's examination." Once violated, his privacy interest in his clothing could not be restored.

It is "a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " (Emphasis in original.) *Mincey* v. *Arizona,* 437 U.S. 385, 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), quoting *Katz* v. *United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *State* v. *Lewis,* 220 Conn. 602, 609, 600 A.2d 1330 (1991). The warrant requirement " 'reflects the sound policy judgment that, absent exceptional circum-

---

[4] The state conceded during oral argument that a warrantless search had in fact occurred. While not technically bound by concessions of counsel, we should not ignore them when a different result might be attained.

stances, the decision to invade the privacy of an individual's personal effects should be made by a neutral magistrate rather than an agent of the Executive.' " *State* v. *Miller,* supra, 219, quoting *California* v. *Acevedo,* 500 U.S. , 111 S. Ct. 1982, 1994–95, 114 L. Ed. 2d 619 (1991) (Stevens, J., dissenting). The warrant requirement is also " 'intended to eliminate altogether searches not based on probable cause. The premise here is that *any* intrusion in the way of a search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity.' (Emphasis in original.)" *State* v. *Miller,* supra, quoting *Coolidge* v. *New Hampshire,* 403 U.S. 443, 467, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). The police failed to obtain a warrant to search the defendant's clothing. The state also failed to identify any exigent circumstance that would excuse or justify a warrantless search.[5] As such, the search of the defendant's clothing violated the defendant's fourth amendment right.

Even if the police had probable cause to believe that the defendant caused the fire, they still required a warrant to conduct the search. See *Chambers* v. *Maroney,* 399 U.S. 42, 61, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970) (Harlan, J., dissenting). In that dissent, Justice Harlan stated that "[t]he Court has long read the Fourth Amendment's proscription of unreasonable searches as imposing a general principle that *a search without a warrant is not justified by the mere knowledge by the searching officers of facts showing probable cause.* The general requirement that a search warrant be obtained is basic to the Amendment's protection of privacy, and

---

[5] The state failed to demonstrate that exigent circumstances were present to justify the warrantless search conducted at the state forensic laboratory. There was no finding by the trial court that any accelerant was visible on the clothing or that the clothing had an odor suggestive of the presence of an accelerant. The state also failed to introduce testimony that the evaporative nature of the accelerant or its evanescence required an immediate search.

the burden is on those seeking [an] exemption . . . to show the need for it." (Citations omitted; emphasis added; internal quotation marks omitted.) Id. Probable cause is not a substitute or excuse for not obtaining a warrant when exigent circumstances or other exceptions to the warrant requirement are not present.[6] Id. The police, thus, could not search the defendant's clothing without first obtaining a warrant.

Even if the search did not violate federal constitutional requirements, our inquiry does not end. See *State* v. *Ephraim,* 28 Conn. App. 306, 309, 610 A.2d 1320, cert. denied, 223 Conn. 925, 614 A.2d 828 (1992); *State* v. *Geisler,* 25 Conn. App. 282, 283–84 n.2, 594 A.2d 985 (1991), aff'd, 222 Conn. 672, 610 A.2d 1225 (1992). Although the defendant asserts that his rights under both the state and federal constitutions were violated, he does not provide a separate analysis of his state constitutional claim. Both this court and our Supreme Court have declined to review a defendant's state constitutional claim, deeming it to have been abandoned, when the defendant has not briefed and analyzed that claim separately. See, e.g., *State* v. *Hernandez,* 204 Conn. 377, 394 n.9, 528 A.2d 794 (1987); *State* v. *Hoeplinger,* 27 Conn. App. 643, 652 n.2, 609 A.2d 1015, cert. denied, 223 Conn. 912, 612 A.2d 59 (1992); *State* v. *Redente,* 19 Conn. App. 521, 531 n.5, 563 A.2d 1365 (1989). That declination, however, does not mean that we are foreclosed from reviewing a claim if we choose to do so. *State* v. *Hoeplinger,* supra; *State* v. *Geisler,* supra.

The defendant claims that the search violated article first, § 7, of the Connecticut constitution. Our courts

[6] In this case, the state has not demonstrated that exigent circumstances or other exceptions to the warrant requirement existed. Although they mention in their brief that both state and defense forensic experts testified to the evaporative quality of gasoline, the trial court never found that this evanescence existed and would permit a warrantless search.

have noted that in some instances, "the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . [I]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit . . . subject only to the qualification that our interpretations [neither] restrict the guarantees accorded the national citizenry under the federal charter [nor conflict with the pronouncements of our state Supreme Court]. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." (Citations omitted; internal quotation marks omitted.) *State* v. *Miller,* supra, 221–22. "Although our state constitutional decisional law is in its infancy, some distinct, principled jurisprudential theories are emerging for determining when it is appropriate to invoke our state constitution and to afford greater protections to Connecticut residents than those supplied by the United States Supreme Court's interpretations of consonant provisions of the federal constitution. . . . [O]ur courts have in some instances interpreted our state constitutional provisions more broadly than their federal counterparts even where, as is the case with the search and seizure provisions of the two documents, there is no material difference between either the texts or the historical backgrounds of the two provisions." Id., 222.

Our state constitution has a "manifest preference" for warrants. Id., 225. Failure to obtain a warrant, even

if not violative of the federal constitution, receives a more exacting scrutiny under our state constitution. Id., 224–25. In this case, however, the police were required to obtain a warrant under both federal and state constitutional provisions.

Although the majority correctly determined that no seizure occurred when the police took custody of the defendant's clothing for safekeeping, a search and seizure did occur when the police opted to relinquish their caretaking function and investigate the defendant's clothing for traces of accelerant. That warrantless search and seizure violated the defendant's fourth amendment rights protected by the United States constitution and his rights under article first, § 7, of the Connecticut constitution. Accordingly, since I would reverse and remand with direction to grant the defendant's motion to suppress and order a new trial, I dissent.