STATE OF CONNECTICUT *v.* WALLACE JOYCE
(14708)

PETERS, C. J., CALLAHAN, BORDEN, BERDON, NORCOTT, KATZ
and SANTANIELLO, Js.

Argued October 25, 1993—decision released March 16, 1994*

* March 16, 1994, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*John R. Williams,* for the appellant (defendant).

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Michael A. Pepper,* assistant state's attorney, for the appellee (state).

BERDON, J. The principal issue in this appeal is whether the state constitution requires the police, while lawfully in custodial possession of a suspect's clothing, to obtain a warrant before subjecting the clothing to a chemical analysis. The defendant, Wallace Joyce, was charged with two counts of arson in the first degree in violation of General Statutes § 53a-111 (a) (3) and (4), respectively.[1] Prior to trial, he moved to suppress certain evidence, including the results of a chemical analysis of his clothing. Although the trial court granted the motion in part, the court refused to suppress the chemical analysis results. After a jury trial, the defendant was convicted of one count of arson in the first

[1] General Statutes § 53a-111 provides in relevant part: "(a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and . . . (3) such fire or explosion was caused for the purpose of collecting insurance proceeds for the resultant loss; or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury."

degree in violation of § 53a-111 (a) (4) and acquitted of the charge under § 53a-111 (a) (3). He was sentenced to a term of imprisonment of twelve years, suspended after four years, fined $5000 and placed on five years probation. On the defendant's appeal, the Appellate Court affirmed the conviction with one judge, *Heiman, J.*, dissenting. *State* v. *Joyce,* 30 Conn. App. 164, 619 A.2d 872 (1993). We granted the defendant's petition for certification.[2] We conclude that the results of the chemical analysis should have been suppressed and therefore reverse the judgment of the Appellate Court.

The following evidence and findings, taken from the suppression hearing except as otherwise indicated, are relevant to the defendant's appeal. On January 29, 1990, fire fighters and paramedics arrived at 125 Maple Street, East Haven, in response to a dispatch call reporting that there had been an explosion at that location. Emergency medical technician Charles Licata, en route to the scene, received a call to step up the priority because there was a patient in need of immediate medical treatment. When Licata arrived, the house at 125 Maple Street was on fire and the defendant was standing in a nearby river, waist deep in water. The defendant appeared to be severely burned. Licata helped the defendant out of the water and up onto an embankment. The defendant's clothing was burned and smoldering and he had first, second and third degree burns over 42 percent of his body. His hands were degloved, meaning that the skin was intact but it was hanging off his hands. Licata cut all of the defendant's clothing off in order to expose his injuries so that they could be cleaned and treated and placed the clothing

[2] We granted the defendant's petition for certification limited to the following issue: "In the circumstances of this case, were the police, while lawfully in custodial possession of the defendant's clothing, required by either the federal or state constitution to obtain a warrant before transferring the clothing to a state laboratory and subjecting it to chemical analysis?" *State* v. *Joyce,* 225 Conn. 911, 623 A.2d 1021 (1993).

on the ground by the side of the road. Licata cleaned the defendant's burns, placed him on a gurney, covered him with a sterile burn dressing, administered oxygen, and periodically wet down his body with a sterile saline solution. He then took the defendant to Yale-New Haven Hospital. In Licata's opinion, based on his training and experience with burn victims, the defendant might have died had he not received immediate medical treatment and transportation to the hospital.

Licata and detective Paul Hemingway rode in the ambulance with the defendant to the hospital. Licata told Hemingway that the defendant's clothing had been left by the roadside. En route to the hospital, Licata asked the defendant what had happened and the defendant responded that he had gone to his parents' house to check on something. He had opened the door, and there had been an explosion. He was not sure if he had been blown out of the house, or if he had run out of the house to the river.

In the emergency room, Hemingway also asked the defendant what had happened, and the defendant repeated what he had told Licata. Hemingway then asked the defendant if he had a car. The defendant stated that he had a pickup truck, parked some distance away from the scene of the fire, at the Professional Building on Foxon Road in East Haven. Hemingway asked the defendant why the car was parked elsewhere, and the defendant responded that he had experienced mechanical problems. The conversation lasted only a minute, ending because the defendant, due to his condition, was no longer able to answer questions. Hemingway also spoke with the defendant's wife. He told her that the police had the defendant's burned clothing and wallet, and that she could pick them up at the police station.

Detective Bruce Scobie took possession of the defendant's clothing, which was lying in a pile on the street. Scobie and Hemingway took the wet items of clothing to the police department, and hung them up to dry. They also inventoried the contents of the defendant's wallet. After the clothing had dried, it was tagged, placed in bags and stored at the police department. Scobie stated that his intention had been to return the clothing to its proper owner, and that he had been carrying out a customary procedure for safekeeping property, because "[i]f we left . . . [the items of clothing] lying in the street they [would] either be thrown out or stolen." Both Scobie and Hemingway stated that the defendant had not been considered a suspect at these initial stages of the investigation. The trial court found that the police had taken custody of the defendant's clothing pursuant to their community caretaking function. See *State* v. *Tully,* 166 Conn. 126, 136, 348 A.2d 603 (1974). Neither party challenges this finding on appeal.

Within a day, the defendant did become a suspect. On January 30, the day after the fire, Scobie gave the defendant's clothing to fire marshall Frederick Brow. Brow immediately brought each item of clothing to the state forensic laboratory in Meriden for chemical testing, except for the defendant's undershirt and dungarees, which he transported two days later. Brow did not obtain a warrant before ordering the chemical analysis of the clothing. The police did, however, apply for and obtain a warrant to seize the defendant's pickup truck several days later.

Jack Hubball, the head of the chemistry section of the state forensic laboratory, employed gas chromatography analysis on each of the defendant's items of clothing. At the defendant's trial, Hubball testified concerning the nature of the test he had performed. In the first step of the procedure, Hubball heated the

garments individually to vaporize any organic material present. In the second step of the procedure, he ran the vapors through a column designed to separate the mixture of chemical compounds inside the vapor according to the differing boiling points of each compound. The machine produced a printout of a pattern that represented the compounds present in the vapor. In the final step of the procedure, Hubball compared the pattern with a library of known signature patterns of organic substances. The pattern on the defendant's shirt, shoes, socks and jeans matched the known pattern for gasoline.[3]

The defendant argues that the chemical analysis of his clothing was the product of an illegal search and seizure under both the fourth amendment to the United States constitution[4] and article first, § 7, of the constitution of Connecticut[5] and therefore should have been suppressed. Since we agree with the defendant that the warrantless chemical analysis of the clothing constituted an unconstitutional search under article first, § 7, we need not reach the claim under the federal constitution.[6] "It is well established that federal

---

[3] The expert also tested carpet and wood samples taken from the house by police, all of which tested positive for the presence of gasoline. The defendant does not challenge the admissibility of the results of these tests.

[4] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[5] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[6] Under the fourth amendment to the United States constitution, there is well settled authority that the police may not freely search undamaged personal property in their caretaking custody, even if the police have probable cause to search the property. *Walter* v. *United States,* 447 U.S. 649,

constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection of such rights. . . . *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984)." (Internal quotation marks omitted.) *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992).

The state argues, however, that we should not review the state constitutional issue because the defendant failed to provide a separate or distinct analysis under the state charter in the Appellate Court. We have made clear that under these circumstances we are not bound to review the state constitutional claim.[7] See, e.g., *State*

---

654, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980), citing *Ex parte Jackson,* 96 U.S. 727, 24 L. Ed. 877 (1878). Our research indicates, however, that there is no decision of the United States Supreme Court, or of any circuit court of the United States, that resolves the critical issue in this case: whether there is a reasonable expectation of privacy in damaged personal property held by the police pursuant to their community caretaking function after being found in a public place. Nevertheless, we need not speculate whether the defendant's expectation of privacy in the damaged clothing would be reasonable under the fourth amendment, because the defendant invokes the state constitution as well as the federal constitution. Accordingly, we do not reach the federal issue.

[7] We point out again the analysis we expect counsel to employ "[i]n order to construe the contours of our state constitution and reach reasoned and principled results . . . ." *State* v. *Geisler,* supra, 222 Conn. 684. Although not every factor is relevant for an adequate state constitutional analysis; *State* v. *Miller,* 227 Conn. 363, 381–82, 630 A.2d 1315 (1993); we listed in *Geisler* the factors which should be analyzed to the extent they are relevant in the particular case. The factors are: "(1) the *textual approach;* see, e.g., *Stolberg* v. *Caldwell,* 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson,* 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981) ('Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution.'); (2) *holdings and dicta of this court, and the Appellate Court;* see, e.g., *Doe* v. *Maher,* 40 Conn. Sup. 394, 448–49, 515 A.2d 134 (1986) (trial court used strict scrutiny to analyze sex discrimination claim based on the equal protection clause of the state constitution, relying, in part, on dicta from the Connecticut Supreme Court regarding what standard would be used once Connecticut's equal rights amendment was adopted); (3) *federal precedent;*

v. *Birch,* 219 Conn. 743, 746 n.4, 594 A.2d 972 (1991). We have never held, however, that we are precluded from doing so. Under appropriate circumstances, review of state constitutional claims may be undertaken despite the failure of a defendant to brief the state constitutional issue in a prior appeal. *State* v. *Geisler,* 25 Conn. App. 282, 283–84 n.2, 594 A.2d 985 (1991), aff'd, 222 Conn. 672, 610 A.2d 1225 (1992). In the present case, the dissent in the Appellate Court was predicated in part on the state constitutional issue.[8] We certified the issue for review under both the federal and state constitutions, and both parties accordingly briefed the state constitutional issue in this court. We conclude that, under the circumstances of this case, we may review the defendant's article first, § 7 claim. See *State* v. *Barrett,* 205 Conn. 437, 445, 534 A.2d 219 (1987).[9]

see, e.g., *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990) ('The adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution.'); (4) *sister state decisions* or sibling approach; see, e.g., *State* v. *Gethers,* 197 Conn. 369, 386–87, 497 A.2d 408 (1985); *Cologne* v. *Westfarms Associates,* supra, [192 Conn. 58–59]; (5) the *historical approach,* including the historical constitutional setting and the debates of the framers; see, e.g., *State* v. *Lamme,* supra, 178–80; *Cologne* v. *Westfarms Associates,* supra, 60–62; *Palka* v. *Walker,* 124 Conn. 121, 126, 198 A. 265 (1938); and (6) *economic/sociological considerations.* See *State* v. *Barton,* [219 Conn. 529, 546, 594 A.2d 917 (1991)]; *State* v. *Dukes,* [209 Conn. 98, 115, 547 A.2d 10 (1988)]; see generally *State* v. *Jewett,* 146 Vt. 221, 500 A.2d 233 (1985); M. Margulies, 'Connecticut's Free Speech Clauses: A Framework and an Agenda,' 65 Conn. B.J. 437 (1991) (an analytical framework for state constitutional analysis in the context of the free speech clauses); E. Peters, 'State Constitutional Law: Federalism in the Common Law Tradition,' 84 Mich. L. Rev. 583 (1986) (book review)." (Emphasis in original.) *State* v. *Geisler,* supra, 685–86.

[8] *State* v. *Joyce,* supra, 30 Conn. App. 188–90 (*Heiman, J.,* dissenting).

[9] In *State* v. *Geisler,* supra, 25 Conn. App. 283–84 n.2, the Appellate Court stated its reasons for reviewing a claim under the state constitution: "Even if we assume that the defendant abandoned his state constitutional claim on appeal but preserved it at the trial level, our decision to review it on remand from the United States Supreme Court is consistent with our case law. In *State* v. *Barrett,* [supra, 205 Conn. 437], our Supreme Court reviewed

In determining whether the results of the chemical test of the defendant's clothing should have been suppressed under the state exclusionary rule,[10] as the product of a search[11] that violated the state constitution, we employ the same analytical framework that would be used under the federal constitution.[12] We must

an unpreserved state constitutional claim, raised for the first time on remand from the United States Supreme Court, under the exceptional circumstances doctrine of *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), which was later refined by *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). It would be illogical to afford *Evans-Golding* review to a defendant, as the one in *Barrett,* who completely failed to preserve his state constitutional claim at the trial court but to deny review to a defendant, such as the one in this case, who preserved it at trial but failed to set forth a separate argument for it in his initial brief to this court."

[10] In *State* v. *Dukes,* 209 Conn. 98, 110, 547 A.2d 10 (1988), we held that article first, § 7, of the constitution of Connecticut is enforced through an exclusionary rule, overruling prior precedent to the contrary, because the rule had become "widely recognized as an effective remedy for enforcement of the constitutional protection against unconstitutional searches and seizures." In doing so, we affirmed the principle that our state constitution is interpreted as a living document. "The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." Id., 115.

[11] Because we find that the chemical analysis of the defendant's clothing constituted an illegal search under the state constitution, we need not reach the issue of whether its transmittal for chemical analysis, while in the lawful custody of the police under their community care function, constituted a seizure.

[12] It is important to note that our adoption of an analytical framework or methodology used under the federal constitution does not compel this court to reach the same outcome that a federal court might reach when the methodology is applied to a particular set of factual circumstances. "Even when the state and Federal Constitutions contain the same [or similar] language and employ the same methodology to govern the interpretation and application of that language, the ultimate constitutional decision often will turn upon a factual assessment of how society feels about certain matters or how society functions under various conditions. . . . In each instance it could matter greatly which society you are talking about: a privacy claim lacking the national consensus necessary to trigger federal constitutional protection might still enjoy local support strong enough to dictate state constitutional protection . . . ." L. Bilionis, "On the Sig-

determine (1) whether there was a reasonable expectation of privacy in the clothing, (2) whether the testing of the clothing at the state laboratory constituted a search, and (3) if so, whether the circumstances of this case fall within a recognized exception to the warrant requirement. For purposes of our analysis, we assume that the police had probable cause at the time of the chemical test to believe that the defendant started the fire.

We note initially that our determination of the constitutionality of the chemical testing of the defendant's clothing is not meaningfully assisted by the express language of article first, § 7, other than the fact that the defendant's clothing was a "possession" and therefore falls within the literal reach of the constitutional language. See *State* v. *DeFusco,* 224 Conn. 627, 635, 620 A.2d 746 (1993). Furthermore, under the circumstances of this case, our determination would not be assisted by a historical analysis of article first, § 7. "[W]e have, on occasion, employed a historical analysis of state constitutional provisions to aid in our determination of their content; see, e.g., *State* v. *Oquendo,* [223 Conn. 635, 650–52, 613 A.2d 1300 (1992)] ('seizure' under article first, §§ 7 and 9); *State* v. *Barton,* 219 Conn. 529, 538 n.4, 594 A.2d 917 (1991) ('probable cause' under article first, § 7) . . . ." *State* v. *DeFusco,* supra, 635.

When interpreting the contours of our state charter of liberty, it is clear that we may look to federal prece-

nificance of Constitutional Spirit," 70 N.C. L. Rev. 1803, 1808–1809 (1992). For example, in *State* v. *Marsala,* 216 Conn. 150, 151, 579 A.2d 58 (1990), we determined that the good faith exception to the fourth amendment exclusionary rule adopted in *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), was "incompatible" with the values underlying article first, § 7, of the constitution of Connecticut. We arrived at this conclusion by undertaking a cost/benefit analysis similar to that employed by the United States Supreme Court in *Leon,* but reached the opposite conclusion from that court. See *State* v. *Marsala,* supra, 167–72; *United States* v. *Leon,* supra, 906–23.

dent. *State* v. *Geisler,* supra, 222 Conn. 685; *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990); see *Michigan* v. *Long,* 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983) (recognizing that in interpreting a state constitution, a state court may "rely on federal precedents as it would on the precedents of all other jurisdictions"). We employ this precedent for guidance and analogy when the federal authorities are "logically persuasive and well-reasoned." W. Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv. L. Rev. 489, 502 (1977) ("state court judges, and also practitioners, do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees").

For the clothing to fall within the protection of article first, § 7, the defendant must have had a reasonable expectation of privacy. In order to meet this rule of standing; *State* v. *Pittman,* 209 Conn. 596, 600–601, 553 A.2d 155 (1989); a two-part subjective/objective test must be satisfied: (1) whether the owner or custodian of the clothing "manifested a subjective expectation of privacy with respect to it"; and (2) whether "that expectation [is] one that society would consider reasonable. . . ." *State* v. *DeFusco,* supra, 224 Conn. 633. This determination is made on a case-by-case basis. *State* v. *Reddick,* 207 Conn. 323, 331, 541 A.2d 1209 (1988). "Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Internal quotation marks omitted.) *State* v. *Mooney,* 218 Conn. 85, 94, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

Our analysis commences with the concession by the state that generally there is a reasonable expectation of privacy in the clothes that one wears. The state does not claim that mere custody of the defendant's property would entitle the police to search the property, and the law holds otherwise. *State* v. *Miller,* 227 Conn. 363, 386–87, 630 A.2d 1315 (1993); *State* v. *Mooney,* supra, 218 Conn. 100 (assuming that upon probable cause the police were entitled to seize belongings found under a bridge and preserve them while a proper search warrant was secured, we held that the warrantless search of the belongings violated the fourth amendment). Instead, the state argues that the defendant had no subjective expectation of privacy because his own conduct, in spilling gasoline on his clothing, manifested no intent to preserve a privacy interest in such incriminating evidence. The state cites no authority for this novel proposition. We simply note that article first, § 7, of the state constitution serves to protect the privacy rights of every citizen, not just those who are intentionally concealing evidence of crimes. Compare *Arizona* v. *Hicks,* 480 U.S. 321, 324–25, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987) (holding that the mere act of moving a piece of stereo equipment to expose its serial number "produce[d] a[n] . . . invasion of respondent's privacy" in violation of the fourth amendment without any suggestion that the defendant intentionally concealed the serial number from view). We conclude that the defendant adequately exhibited his subjective expectation of privacy, as he "merely left his property behind him, more or less of necessity, making no attempt, however, to discard it or disassociate it from himself."[13] *State*

[13] The Appellate Court, after conceding that a person generally has an expectation of privacy in his personal clothing, found that the defendant did not, in part, because he "failed to exhibit any expectation of privacy in his clothing after the police took it into custody for safekeeping." *State* v. *Joyce,* supra, 30 Conn. App. 172. Although the state does not rely upon this argument in its brief to this court, the dissent does. Therefore, we will

v. *Philbrick,* 436 A.2d 844, 855 (Me. 1981), on appeal after remand, 481 A.2d 488 (Me. 1984) (no abandonment found where injured defendant left his knapsack by side of road, hitchhiked to police station, and then told police that pack belonged to him).

The state also argues that because the gasoline spill resulted in the emission of a detectable odor, the defendant's expectation of privacy was objectively unreasonable. The state analogizes the gasoline spill to a coffee stain on clothing that comes within the plain view of the police. The state's analogy is misplaced. The record contains no evidence that the defendant's clothing did in fact emit any odor detectable by the human sense of smell.[14]

briefly address it. The defendant's clothing was removed from him when his skin was falling off as a result of severe burns, and sent to the forensic laboratory while the defendant lay in the hospital near death, only one day after the incident. Under these circumstances, it cannot be said that the defendant failed to exhibit his expectation of privacy by not retrieving his clothing during this twenty-four hour period.

In *State* v. *Mooney,* supra, 218 Conn. 94, a case decided under the fourth amendment, a homeless man kept his belongings in a cardboard box and duffel bag under a bridge. He was arrested pursuant to a warrant, and hours later his belongings were seized and searched by police without a search warrant. We found that there was "no element of conduct manifesting a temporary intent to relinquish an expectation of privacy in the contents" of the box and bag and, "of course, no contrary intent can be inferred from the fact that the police arrested him and thus prevented him from returning to his goods and effects that night." Id., 109.

Similarly, the record in the present case discloses no conduct by the defendant manifesting an intent to relinquish his expectation of privacy in his clothing, and no indication that the police were unaware that his severe burns and hospitalization would explain his failure to go to the police station and claim his clothing within twenty-four hours of the fire. Cf. *State* v. *Newman,* 292 Or. 216, 637 P.2d 143 (1981), cert. denied, 457 U.S. 1111, 102 S. Ct. 2915, 73 L. Ed. 2d 1321 (1982) (warrantless search by police of defendant's purse suppressed when purse found on ground beside defendant's car, defendant was intoxicated, officer knew whose purse it was, and officer was merely transporting defendant to detoxification center).

[14] Our review of the record does not reveal testimony by any witness that he or she was able to smell the presence of gasoline on the defendant's clothing, although several witnesses testified that they smelled gasoline in the

The dissent asserts, however, that the defendant's reasonable expectation of privacy is diminished by the fact that the clothing was damaged by the fire. Although the items of clothing tested at the state laboratory were unusable as clothing and reduced to rags, they were still the defendant's rags.[15] Compare *State v. Zindros,* 189 Conn. 228, 238–40, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984) (under fourth amendment of United States constitution, and article first, § 7, of Connecticut constitution, defendant retained reasonable expectation of privacy in burned out and boarded up building containing damaged personal property). Under all the circumstances of this case, we conclude that the defendant's expectation of privacy was a reasonable one under article first, § 7, of the state constitution.

The next issue to be decided under our state constitution is whether the testing of the clothing at the state laboratory constituted a search. In the first instance, the answer to the question of whether the chemical testing of the clothing constituted a search borders on the obvious. Furthermore, the question has largely been answered by our determination that the defendant had a reasonable expectation of privacy in the invisible and odorless chemicals present in his clothing. See *United States v. Jacobsen,* 466 U.S. 109, 122, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) ("[w]e must first determine whether [official conduct] can be considered a 'search' subject to the Fourth Amendment—did it infringe an

house after the fire. We note that although the state's chemist, Hubball, testified that part of his standard procedure is to take the item to be tested and "smell it a little bit to see if I can smell any accelerants . . . that may be there in a very high level," he did not testify that he was able to smell any accelerants on the defendant's clothing.

[15] We take judicial notice that the defendant's shirt, entered into evidence as an exhibit at the trial, contained a wristwatch, still ticking, when delivered to this court.

expectation of privacy that society is prepared to consider reasonable"). Moreover, as previously noted, the testimony of the expert witness Hubball indicates that government conduct invaded the defendant's reasonable expectation of privacy through the use of a machine designed to detect the presence and identity of many organic compounds by heating clothing items and analyzing the resultant vapors. We conclude that this chemical test, capable of determining a multitude of private facts about an individual,[16] constituted a search under article first, § 7, of the state constitution.[17]

The state finally claims that if there was a search, it was not unreasonable and therefore passes constitutional muster. Under the state constitution, all warrantless searches, whether or not the police have probable cause to believe that a crime was committed, are per

---

[16] That the gas chromatograph utilized by Hubball was capable of exposing rather private facts about an individual is evidenced by Hubball's testimony before the jury that his machine detected the presence of an organic material in the defendant's underwear that was not an accelerant.

[17] The state argues that there was no search in the present case, relying on holdings of the United States Supreme Court that certain search methods do not constitute searches under the fourth amendment because they are minimally intrusive and detect only the presence of contraband. *United States* v. *Jacobsen,* supra, 466 U.S. 123 and n.23 (field test of white powder not fourth amendment search because limited to determining the presence or absence of illegal contraband cocaine); *United States* v. *Place,* 462 U.S. 696, 707, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) (dog sniff for marijuana is "sui generis" type of search that offends no legitimate privacy interest because minimally intrusive and detects only presence or absence of contraband). Although we express no opinion on the validity of these holdings under our state constitution, we note that the search methods employed therein are quite distinguishable from that of the present case. Both of these cases expressly turn on the fact that the tests employed detect only the presence of contraband narcotics, and the possession of narcotics is not a "private fact" under the fourth amendment. *United States* v. *Jacobsen,* supra, 123; *United States* v. *Place,* supra, 707. As discussed above, however, the gas chromatograph test is not designed to detect the presence of contraband, and in fact detects the presence and identity of many organic substances.

se unreasonable, unless they fall within one of a few specifically established and well delineated exceptions to the warrant requirement. *State* v. *Blades,* 225 Conn. 609, 617, 626 A.2d 273 (1993).

In *State* v. *Miller,* supra, 227 Conn. 363, we recently explained the reasoning underlying the warrant requirement. "Our [state] constitutional preference for warrants reflects a goal of protecting citizens from unjustified police intrusions by interposing a neutral decisionmaker between the police and the object of the proposed search. See *State* v. *Diaz,* [226 Conn. 514, 628 A.2d 567 (1993)]; cf. *State* v. *Jackson,* 162 Conn. 440, 444, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972) (purpose of fourth amendment is to require neutral and detached magistrate to make probable cause determination). Accordingly, a search is invalid if the police, without a justification rooted in a valid exception to the warrant requirement, have relied upon only their own probable cause evaluation, even if later found to be correct, before searching. We thus read the two clauses of article first, § 7, in conjunction—a warrantless search is per se unreasonable, justified only by limited exceptions—rather than in disjunction—a search is valid if it is reasonable, and the presence of a warrant is just one factor in the determination of reasonableness. Cf., e.g., *State* v. *Badgett,* 200 Conn. 412, 423, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986) (construing fourth amendment to bar warrantless searches as per se unreasonable); see generally *State* v. *Larocco,* 794 P.2d 460, 467–69 (Utah 1990) (extensive discussion of the consequences of reading the two clauses of the fourth amendment in conjunction and in disjunction); R. Bloom, 'Warrant Requirement—The Burger Court Approach,' 53 U. Colo. L. Rev. 691 (1982).

"Our constitutional preference for warrants is overcome only in specific and limited circumstances. See, e.g., *State* v. *Geisler,* supra, [222 Conn.] 691 (recognizing emergency exception as matter of state constitutional law); *State* v. *Delossantos,* 211 Conn. 258, 266–67, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989) (recognizing exception for search incident to arrest as matter of state constitutional law); *State* v. *Dukes,* [209 Conn. 98, 126, 547 A.2d 10 (1988)] (recognizing automobile exception on the highway as a matter of state constitutional law). These recognized exceptions derive primarily from acknowledged interests in protecting the safety of the police and the public and in preserving evidence." *State* v. *Miller,* supra, 227 Conn. 382–83.

In *Miller,* as in the present case, the police had possession of the defendant's property—that is, a car that had been towed and impounded following the arrest of the defendant—and the defendant did not challenge the constitutionality of the method by which the police had gained possession of the car. Id., 368. The police searched the impounded car without obtaining a warrant, and found a .357 Smith and Wesson revolver in the trunk. Id. The defendant was subsequently convicted of criminal possession of a weapon upon this evidence. Id. Under our state constitution, we refused to expand the automobile exception[18] to the warrant requirement to include a warrantless search at the police station while the automobile is in lawful custody. We held that "[i]n light of our demonstrated constitutional preference for warrants and our concomitant obligation narrowly to circumscribe exceptions to the state constitutional warrant requirement, we conclude

---

[18] In *Chambers* v. *Maroney,* 399 U.S. 42, 51, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), the United States Supreme Court interpreted the fourth amendment to permit a warrantless search, upon probable cause, of an automobile in the lawful custody of the police.

that a warrantless automobile search supported by probable cause, but conducted after the automobile has been impounded at the police station, violates article first, § 7, of the Connecticut constitution." Id., 386–87.

The circumstances of the search in the present case present an even more compelling case for requiring a warrant than those of *State* v. *Miller,* supra, 227 Conn. 363. In *Miller,* the state argued for the expansion of a recognized exception to the warrant requirement under the state constitution, the automobile exception. In the present case, the state is unable to identify any exception to the warrant requirement that could encompass the warrantless search of the defendant's clothes.[19] Our concern for the right to personal privacy and our preference for the warrant to protect that privacy was recently underscored when we pointed out that even if the police act without a warrant under the emergency exception, once that emergency ceases to exist, the police must terminate their intrusive conduct. *State* v. *Geisler,* supra, 222 Conn. 695–96. Accordingly, we conclude that the chemical analysis of the defendant's clothing should have been suppressed as the result of a warrantless search unsupported by exigent circumstances or any other recognized exception to the warrant requirement.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to

[19] When a defendant moves to suppress evidence offered from a warrantless search, the burden is on the state to prove the existence of an exception to the warrant requirement. *State* v. *Copeland,* 205 Conn. 201, 209–10, 530 A.2d 603 (1987). Although the state argues on appeal that the evaporative properties of gasoline present exigent circumstances for a warrantless search, the state did not make this argument before the trial court, and consequently no testimony was presented with regard to whether the evidence was so evanescent as to constitute exigent circumstances. This court does not find facts. *State* v. *Reagan,* 209 Conn. 1, 8, 546 A.2d 839 (1988), on remand, 18 Conn. App. 32, 556 A.2d 183, cert. denied, 211 Conn. 805, 559 A.2d 1139 (1989). We therefore decline to consider this argument.

reverse the judgment of the trial court and remand the case to that court for a new trial on the count of arson in the first degree.

In this opinion, PETERS, C. J., BORDEN, NORCOTT and KATZ, Js., concurred.

CALLAHAN, J., with whom SANTANIELLO, J., joins, dissenting.

I dissent from the majority opinion because I do not believe that the defendant had a reasonable expectation of privacy in the burnt remnants of his clothing.

In order to claim the protection of the fourth amendment prohibition against unreasonable searches and seizures, a defendant must establish that he or she had a legitimate expectation of privacy in the invaded property. *State* v. *Mooney,* 218 Conn. 85, 94, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). "Absent such an expectation, the subsequent police action has no constitutional ramifications." Id., citing *State* v. *Brown,* 198 Conn. 348, 355, 503 A.2d 566 (1986). In order to determine whether a defendant harbored such an expectation, we inquire into (1) whether the individual manifested a subjective expectation of privacy, and (2) whether that expectation was one that society would consider reasonable. *State* v. *DeFusco,* 224 Conn. 627, 633, 620 A.2d 746 (1993), citing *Katz* v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). The determination of whether the defendant has established a reasonable expectation of privacy must be made on a case-by-case basis; *State* v. *Mooney,* supra, 94; and by undertaking a factual inquiry into all of the relevant circumstances. *State* v. *Reddick,* 207 Conn. 323, 331, 541 A.2d 1209 (1988).

In the present case, when the fire fighters arrived on the scene of the fire, the defendant was standing in a

river with severe burns over most of the front of his body. The defendant's clothes were cut off in order to allow treatment of his burns. *State* v. *Joyce,* 30 Conn. App. 164, 166, 619 A.2d 872 (1993). A fire fighter described the defendant's clothing as charred and " 'mostly burned off his body in all the areas where he had the third and second degree burns.' " Id. The burned clothing was deposited in a wet pile alongside a public road. Id., 166–67. The defendant concedes that the police could properly have made a decision, as they did, to take his burned clothing to the police station as part of their community caretaking function. Id., 169. Nothing in the record indicates that the defendant articulated or otherwise manifested any subjective expectation of privacy in the remnants of his clothing. Moreover, even if the defendant had somehow manifested a subjective expectation of privacy, I believe that such an expectation is one that society would not recognize as reasonable. The defendant contends, nevertheless, that an unreasonable search occurred when the police transferred the clothes from police headquarters to the forensic laboratory to be tested for traces of gasoline.

At the outset, any expectation of privacy that the defendant may have had in his clothing was diminished by virtue of their condition and their treatment. The trial court opined that the remnants were no longer usable as clothing. *State* v. *Joyce,* supra, 30 Conn. App. 167 n.6. While a reasonable expectation of privacy may attach to one's clothing, that expectation necessarily diminishes when the clothing is reduced to burnt remnants placed by the roadside.

The majority relies on *State* v. *Zindros,* 189 Conn. 228, 240, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984), for the proposition that a person's expectation of privacy in

property does not disappear merely because the property is damaged. I agree.. The present case, however, is distinguishable from *Zindros.*

In *Zindros,* we concluded that the defendant had a reasonable expectation of privacy in a "burned out and boarded up building." Id. That conclusion was based on evidence that the defendant "always secured the site upon leaving" because he stored merchandise there worth approximately $6750. Id. Thus, the defendant's subjective expectation of privacy, evidenced by his securing the building every time he left, was reasonable because the building was still able to be closed up and was being used as a depository for his personal property. In the present case, the defendant's clothing was no longer usable as such and the defendant neither expressed nor exhibited any interest in the remnants until the test results were to be introduced into evidence.[1] Any reasonable expectation of privacy that might attach to clothing in general was severely diminished as a result.

Furthermore, "an inadvertent leaving of effects in a public place, whether or not an abandonment in the true sense of the word, can amount to a loss of any justified expectation of privacy." W. LaFave, Search & Seizure (Sup. 1994) § 2.6, p. 94; see *Wagner* v. *Hedrick,* 181 W. Va. 482, 383 S.E.2d 286 (1989) (no reasonable expectation of privacy in personal effects removed by hospital personnel and left in hospital emergency room freely accessible to law enforcement officers, medical personnel and public in general); *Sullivan* v. *District Court of New Hampshire,* 384 Mass. 736, 742, 429 N.E.2d 335 (1981) (no reasonable expectation of privacy in jacket inadvertently left in common area of hospi-

---

[1] It appears that the defendant's wallet, on the other hand, which was also picked up from the roadside by the police, was retrieved by the defendant's wife the day after the incident.

tal). In the present case, the remnants of the defendant's clothing were left on the side of the road, readily accessible to the public and law enforcement personnel.

Nor did the defendant retain an expectation of privacy in his burnt clothing merely because a police officer, rather than a passerby, happened to retrieve the remnants from the roadside. We have refused to recognize that one's expectation of privacy depends upon who comes into possession of the property in question. "A person either has an objectively reasonable expectation of privacy or does not; what is objectively reasonable cannot, logically, depend on the source of the intrusion on his or her privacy." *State* v. *DeFusco,* supra, 224 Conn. 638–39. Finally, an expectation of privacy does not attach to property merely because it may constitute incriminating evidence. See *Rakas* v. *Illinois,* 439 U.S. 128, 143 n.12, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979) (noting that while a defendant may have a subjective expectation of privacy in incriminating evidence, that expectation is not one society is prepared to recognize as reasonable).

I dissent.