******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., concurring. I agree with the majority that, because neither of the claims raised by the defendant, Joanne A. Skok, have merit, the judgment of the trial court should be affirmed. I write separately, however, to reiterate my belief that the method we adopted in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), for analyzing state constitutional claims requires modification. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 442,     A.2d     (2015) (*Zarella, J.*, concurring). In my view, only three of the six factors articulated in *Geisler*—the text of our constitution, state constitutional history, and Connecticut precedent—are consistently relevant. The other three factors vary in their relevance. Although there may be occasions when federal case law illuminates the meaning of provisions in our state constitution, I believe the precedent of our sister states and economic and sociological considerations rarely, if ever, are useful for this purpose. In the present case, the majority correctly concludes that neither the text of the state constitution, its history, nor our precedent supports the defendant's claim under article first, § 7, of the Connecticut constitution. The majority nevertheless proceeds to consider the case law of other jurisdictions as well as economic and sociological concerns, which I believe should play no role in our resolution of the defendant's claim. Accordingly, I respectfully concur.

In the following discussion, I first provide a brief history of *Geisler* and the formulaic manner in which we have applied it. I then explain what I believe to be the appropriate method of interpreting the state constitution and why we generally should not consider the three *Geisler* factors that are not specific to Connecticut. Finally, I explain why the present case perfectly demonstrates the problems with how *Geisler* has previously been applied.

The stated purpose of *Geisler* was to construct a coherent method for analyzing the rights and privileges provided in the Connecticut constitution separate from, and in addition to, rights found in the federal constitution. The court in *Geisler* thus set forth six "tools of analysis" to apply in resolving state constitutional claims, namely, "(1) the textual approach . . . (2) holdings and dicta of this court, and the Appellate Court . . . (3) federal precedent . . . (4) sister state decisions . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations." (Citations omitted; emphasis omitted.) *State* v. *Geisler*, supra, 222 Conn. 685. The court stated that each analytical tool "should be considered to the extent applicable . . . ." Id.

After *Geisler* was decided, however, this court immediately began referring to these tools of analysis as "factors"; *State* v. *Miller*, 227 Conn. 363, 380, 630 A.2d 1315 (1993); and analyzing all six factors without explaining how each factor was applicable in any given case.[1] See, e.g., *State* v. *Kelly*, 313 Conn. 1, 14–30, 95 A.3d 1081 (2014); *Washington* v. *Meachum*, 238 Conn. 692, 716–25, 680 A.2d 262 (1996); cf. *Moore* v. *Ganim*, 233 Conn. 557, 628, 660 A.2d 742 (1995) (*Peters, C. J.*, concurring) ("[t]he test that we apply to interpret our state constitution *requires* us to consult, inter alia, history" [emphasis added]). The court's mechanistic application of *Geisler* was further evidenced by the fact that we sometimes declined to review state constitutional claims when claimants failed to brief every *Geisler* factor. See, e.g., *Aselton* v. *East Hartford*, 277 Conn. 120, 152–55, 890 A.2d 1250 (2006) (declining to review state constitutional claim because claimant briefed only Connecticut and federal case law without addressing other *Geisler* factors); cf. *State* v. *Colon*, 272 Conn. 106, 154 n.26, 864 A.2d 666 (2004) (declining to review defendant's state constitutional claims because, inter alia, he had failed to analyze *Geisler* factors "separately and distinctly"), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). More troubling, this court never has clarified the relative weight that should be accorded to each factor. Consequently, our decisions often have read like scorecards in which we unthinkingly have tallied how many factors supported the position of the claimant versus that of the opposing party. See, e.g., *State* v. *Ledbetter*, 275 Conn. 534, 569, 881 A.2d 290 (2005) ("[i]n light of the factors that weigh in favor of the state, [economic and sociological considerations] are insufficient to tilt the balance of the *Geisler* analysis in favor of the defendant"), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

Apart from the mechanistic quality of this approach, applying *Geisler* in this manner incorrectly has given the impression that all six *Geisler* factors are of equal importance. I believe, however, that they are of vastly different importance. Although our reasoning in *Geisler* may have been correct insofar as it suggested that a variety of sources may be useful in interpreting the state constitution, I believe the relative importance of each factor must be clarified. Accordingly, I propose retaining *Geisler* with the following modifications for the purpose of analyzing state constitutional claims and interpreting the contours of our state constitution.

First, when initially presented with a state constitutional claim, we always should examine the text of the constitutional provision in question, our prior interpretations of the provision, and any relevant constitutional history relating to its adoption. See G. Tarr, Understanding State Constitutions (1998) p. 209 (encouraging "state courts to examine more closely the text and

history of their constitutional provisions . . . to determine . . . the meaning of the state's provision"); cf. *Zivotofsky ex rel. Zivotofsky* v. *Kerry*, U.S. , 135 S. Ct. 2076, 2084, 192 L. Ed. 2d 83 (2015) ("[t]o determine whether the President possesses the exclusive power of recognition the [c]ourt examines the [United States] [c]onstitution's text and structure, as well as precedent and history bearing on the question"). The reason we must give primacy to the text of the constitution is because that is the language from which state constitutional claims arise. In addition, the principle of stare decisis and common sense dictate that we should look to our prior interpretations of constitutional language to resolve claims involving that same language. See, e.g., *Perry* v. *Perry*, 312 Conn. 600, 614, 95 A.3d 500 (2014) (stare decisis "gives stability and continuity to our case law" [internal quotation marks omitted]); cf. *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013) ("[i]n interpreting the [statutory] language . . . we do not write on a clean slate, but are bound by our previous judicial interpretations of the language"). Finally, our state's constitutional history is relevant in resolving a state constitutional claim because understanding the intent of those who drafted the language in question necessarily clarifies its meaning.[2] See G. Tarr, supra, p. 194 ("[i]f the distinctive origins or purpose of a provision justifies independent interpretation, then state jurists must pay particular attention to the intent of the framers and to the historical circumstances out of which the constitutional provision arose"); see also Developments in the Law, "The Interpretation of State Constitutional Rights," 95 Harv. L. Rev. 1324, 1387 (1982) (nontextual factors to consider include "state legal history, state constitutional history, and local tradition").

All three of these interpretive tools are directly related to the document we must interpret when presented with a state constitutional claim. In contrast, the remaining three *Geisler* factors, namely, federal case law, sister state case law, and economic and sociological considerations, are not directly related to our state constitution. I thus address each of these three factors to explain why we should not consider them without good reason.

I begin with federal precedent, the third *Geisler* factor. See *State* v. *Geisler*, supra, 222 Conn. 685. In *Geisler*, this factor was accompanied by a citation to *State* v. *Lamme*, 216 Conn. 172, 579 A.2d 484 (1990), in which we stated that "[t]he adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution." Id., 184; see also *State* v. *Joyce*, 229 Conn. 10, 18 n.12, 639 A.2d 1007 (1994) ("our adoption of an analytical framework or methodology used under the federal constitution does

not compel this court to reach the same outcome that a federal court might reach when the methodology is applied to a particular set of factual circumstances"). Thus, this *Geisler* factor apparently is intended to allow a court to consider federal case law, as long as the state constitutional provision is open textured, that is, susceptible to different interpretations, and we do not blindly adopt federal interpretations of a similar federal constitutional provision.

I disagree with this understanding because it is too broad. Our system of government is a "system of dual constitutionalism" in which the states have crafted unique constitutions distinct from the federal constitution. G. Tarr, supra, p. 181. This requires state courts to interpret their own constitutions independently of federal court interpretations of the federal constitution. See id. As Hans A. Linde, a former justice of the Oregon Supreme Court, has suggested: "The right question is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the [United States] Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand. The answer may [or may not] turn out the same as it would under federal law." H. Linde, "E Pluribus—Constitutional Theory and State Courts," 18 Ga. L. Rev. 165, 179 (1984); see also G. Tarr, supra, p. 209 ("[s]tate constitutions are distinctive documents, and the approach to their interpretation must take account of that distinctiveness"). This means that, even when the state constitutional provision at issue is open textured, the focus of our state constitutional analysis should be on factors specific to the Connecticut constitution.

Federal case law is not specific to our constitution and, therefore, should play only a supplementary role, if any, in the interpretation of a state constitutional provision. More specifically, we should consider federal case law only if there is an explicit connection between provisions of the federal constitution and our own constitution. Federal case law may be useful in guiding our interpretation of the state constitution if there is historical evidence that a provision of our constitution was patterned after that of the federal constitution and the phraseology of the provisions is the same or similar in all material respects. See, e.g., *State* v. *Davis*, 283 Conn. 280, 306–307, 929 A.2d 278 (2007) (noting resemblance between language of fourth amendment to United States constitution and that of article first, § 7, of Connecticut constitution). Even in that instance, however, we still must independently interpret the state constitutional provision, examining it in the context of our constitution as a whole rather than adopting the federal interpretation of a similar federal constitutional provision in lockstep fashion. In sum, we should not consider federal case law unless the state constitutional provision at issue is open textured, and, if it is, only

after providing justification as to how federal precedent is relevant to the state constitutional provision.

The same is true of case law from other jurisdictions, which is the fourth *Geisler* factor. See *State* v. *Geisler*, supra, 222 Conn. 685. The problem is not the per se relevance of case law from our sister states in our interpretation of the state constitution; rather, the concern is that we sometimes have considered it regardless of whether it has any connection to our state constitution. In the past, we have assumed that case law from other states is relevant in interpreting our constitution without considering whether their constitutional provisions predate ours or whether there are significant textual differences between the language in our constitution and in the constitutions of the other states. See, e.g., *State* v. *Lockhart*, 298 Conn. 537, 556–64 and n.10, 4 A.3d 1176 (2010) (surveying sister state decisions in deciding whether state constitution requires police to electronically record custodial interrogations as prerequisite to admissibility of confessions). Instead, we should *not* consider case law from another state unless there is a connection between the language in the Connecticut constitution and that of the other state's constitution that renders its case law relevant. For instance, historical evidence indicates that our 1818 constitution was based at least in part on Mississippi's 1817 constitution. See, e.g., *State* v. *Williams*, 311 Conn. 626, 634, 88 A.3d 534 (2014). Interpretations of the Mississippi constitution therefore may be useful in understanding our own constitution. Additionally, if we adopt a provision of another state's constitution, then decisions from that state issued before our adoption of the provision may be relevant. See G. Tarr, supra, p. 207 ("if decisions exist interpreting [another state's] provision, then a state in adopting the provision knows what the consequences of the choice are"). In the absence of such a connection, however, interpretations by other state courts of their respective state constitutions should have no bearing on our understanding of the Connecticut constitution.

This, again, is a consequence of the fact that constitutional claims are controlled by the unique language of the relevant constitutional provision, unlike common-law claims, for which we often have "sought to benefit from the collective wisdom and experience of our sister states." *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 573, 113 A.3d 932 (2015); see also id. (looking to "evolving consensus of our sister states" to determine scope of liability for bystander emotional distress claim). Questions regarding the scope of tort or contract liability, for example, often reflect public policy judgments. Thus, surveying sister state case law and its impact in those states from a policy perspective can inform our own common-law decisions. See, e.g., *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 341–43 and nn. 9–10, 107 A.3d 381 (2015) (surveying sister state

case law to determine whether public policy supports imposing duty on landlord to remove cinderblocks from common area of apartment building). When deciding a state constitutional claim, on the other hand, we are bound to the language of the specific text unique to our state, which generally makes sister state case law irrelevant in any given case. See, e.g., G. Tarr, supra, p. 200 ("in interpreting a state constitution, a state court is interpreting a unique collection of provisions with a distinctive generating history"). We thus should not consider the case law of our sister states unless there is good reason to do so.

Finally, with respect to the last *Geisler* factor, economic and sociological considerations; see *State* v. *Geisler*, supra, 222 Conn. 685; otherwise referred to as public policy considerations, we never have precisely defined what type of analysis this factor entails. In *Geisler*, we cited a number of cases to explain this factor; id.; but those cases vary in their meaning. In *State* v. *Barton*, 219 Conn. 529, 594 A.2d 917 (1991), we simply stated that, in considering whether to adopt a federal interpretation as a matter of state constitutional law, we first should consider "the history and policy concerns of analogous Connecticut constitutional provisions . . . ." Id., 546. In *State* v. *Dukes*, 209 Conn. 98, 547 A.2d 10 (1988), we stated that "[c]onstitutional provisions must be interpreted within the context of the times." Id., 114. Lastly, in *State* v. *Jewett*, 146 Vt. 221, 500 A.2d 233 (1985), the Vermont Supreme Court discussed the usefulness of "Brandeis" briefs, that is, briefs that rely on sociological and scientific statistics, in deciding constitutional questions. Id., 227. Although these cases speak to the general purpose of this *Geisler* factor, they do not define what considerations should be taken into account and the weight they should be accorded.

Irrespective of the purpose this factor originally was intended to serve, we have applied it primarily in two different ways, neither of which justifies its inclusion in the methodology that we use for state constitutional interpretation. First, we have used it to independently review the public policy implications of potential constitutional rulings. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 247, 957 A.2d 407 (2008) (under sixth *Geisler* factor, "we consider the public policy ramifications of invalidating the statutory scheme barring same sex marriage"). It is entirely inappropriate for us to engage in this type of analysis, however, because the legislature, not the judiciary, "has the primary responsibility for formulating public policy . . . ." (Citation omitted; internal quotation marks omitted.) *Sic* v. *Nunan*, 307 Conn. 399, 410, 54 A.3d 553 (2012); see also *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 65, 469 A.2d 1201 (1984) ("It is not the role of this court to strike precise balances among the fluctuating interests of competing private groups which then

become rigidified in the granite of constitutional adjudication. That function has traditionally been performed by the legislature, which has far greater competence and flexibility to deal with the myriad complications [that] may arise from the exercise of constitutional rights by some in diminution of those of others."). Thus, we must leave policy judgments to the legislature, which is free to propose an amendment to the state constitution to effectuate public policy. See Conn. Const., amend. VI; see also footnote 2 of this opinion (noting that our constitution has been amended numerous times).

Alternatively, in applying this *Geisler* factor, we have attempted to glean public policy by looking to the legislature's statutory enactments, as the majority does in the present case. See part I of the majority opinion; see also *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 436–39. This approach, however, inevitably is circular in its reasoning, at least with respect to constitutional challenges to statutes. If legislative action defines public policy, then public policy always will support the constitutionality of the challenged statute because the legislature passed the statute. See, e.g., *State* v. *Santiago*, 318 Conn. 1, 377,      A.3d      (2015) (*Zarella, J.*, dissenting). Moreover, it is inappropriate to defer to the legislature to determine the constitutionality of a statute or to interpret the constitution generally because "[w]e . . . serve as the body through which our state laws will be measured against the Connecticut constitution." *State* v. *McCahill*, 261 Conn. 492, 504, 811 A.2d 667 (2002). Accordingly, we simply should not interpret our state constitution by examining public policy concerns.

That is not to say that our constitution always should be read literally and that modern realities should be ignored. To the contrary, I agree that many of the most important provisions of the Connecticut constitution were drafted in general language that is open textured because they were "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs."[3] (Emphasis omitted.) *M'Culloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 415, 4 L. Ed. 579 (1819). In interpreting the state constitution, we therefore must determine how constitutional provisions apply in contexts that the framers never could have anticipated. To do so, however, we must, as I previously discussed, determine the applicability of constitutional provisions by analyzing the text, our precedents, and our history, because applying constitutional provisions in new contexts does not mean changing the meaning of constitutional provisions on the basis of the court's public policy concerns.

The majority's analysis in the present case reveals the problems with applying *Geisler* as though it mandates consideration of all six factors. The majority begins

by correctly noting that there is no support for the defendant's claim in the text of our constitution, its history, or our precedent. The majority nonetheless proceeds to analyze the claim under the remaining three *Geisler* factors. This suggests that, even though nothing in our constitution, case law, or history indicates that the police are prohibited from recording a phone conversation with the consent of only one party, we nevertheless would impose such a restriction if federal courts and other state courts have done so and if such a rule is preferable as a matter of public policy.[4] In my view, this makes no sense.

The majority's analysis also illustrates why it is illogical to consider sources that have no connection to our state constitution. For instance, the majority surveys cases from two dozen states without explaining how the respective constitutions of those states are relevant to our constitution. See footnote 10 of the majority opinion and accompanying text. The majority analyzes the text of only one state's constitution, namely, Montana, which constitution the majority notes has been interpreted as prohibiting the type of state action challenged in the present case because it includes a provision that protects the "right of individual privacy," and because, during the debates of a Montana constitutional convention, delegates specifically "decried electronic monitoring and eavesdropping in general . . . ." (Internal quotation marks omitted.) Part I of the majority opinion, quoting *State* v. *Allen*, 357 Mont. 495, 511, 514, 241 P.3d 1045 (2010). Instead of worrying about how the Montana Supreme Court has interpreted the Montana constitution, however, we should be concerned with whether the text of *our* constitution includes a right of individual privacy and whether the delegates to *our* constitutional conventions disapproved of electronic monitoring generally.

In sum, the text of our constitution, the history and legal traditions of our state, and our precedent interpreting our constitution are the significant "tools of analysis" to be used in understanding the parameters of our constitution. *State* v. *Geisler*, supra, 222 Conn. 685. They are the tools that are directly related to the document itself. Federal and state decisions, and economic and sociological considerations, are only marginally useful and then only if they can be shown to have some connection that makes them relevant to the drafting of our constitutional provision. Accordingly, although I agree with the majority that neither the text of our constitution, our history, nor our case law supports the defendant's claim, I object to the majority's further consideration of factors that have no relevance to our state constitution. I therefore respectfully concur.

[1] There are a few cases in which we have not considered every factor. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 246 n.73, 957 A.2d 407 (2008) (considering each *Geisler* factor except constitutional history); cf. *State* v. *Canales*, 281 Conn. 572, 597 n.16, 916 A.2d 767 (2007) (addressing state constitutional claim, even though defendant did

not invoke *Geisler* factors, because defendant's presentation of her constitutional claim was "sufficiently clear and thorough as to constitute a functionally adequate *Geisler* analysis"). In the large majority of cases, however, including the present case, we have analyzed all six factors in applying *Geisler*.

[2] In contrast to some provisions of the federal constitution, state constitutional provisions also generally lend themselves to historical analysis because state constitutions often are more recently adopted and more frequently amended. See G. Tarr, supra, pp. 195–96. Thus, there generally is less concern that historical evidence regarding the intent of the framers will be unavailable. For instance, in Connecticut, the 1965 constitutional convention provides us with an abundant source of information about the provisions added at that convention, as well as proposed provisions that were rejected, which can inform our understanding of provisions from the Connecticut constitution of 1818. Additionally, the Connecticut constitution has been amended multiple times, each of which can provide us with historical insight into why the legislature and citizens of Connecticut had decided to change the language of our constitution.

[3] With that said, I also note that not every state constitutional provision is the same; some are drafted in broad language and others in more specific language. See G. Tarr, supra, p. 189. Accordingly, how we analyze the text of a constitutional provision may vary depending on the structure and language of a given provision.

[4] I agree with the majority that, in the present case, our constitutional history reveals that the federal constitution, and therefore federal case law, is relevant to the defendant's claim. As the majority explains, the text of article first, § 7, of the Connecticut constitution was based on the fourth amendment to the United States constitution. Thus, on the basis of this historical connection, I agree that federal case law is useful in resolving the defendant's claim.