******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TIMOTHY J. QUAIL, SR.
(AC 38308)

Beach, Keller and Bishop, Js.

*Argued March 10—officially released October 4, 2016*

(Appeal from Superior Court, judicial district of Windham, geographical area number eleven, Swords, J.)

*Daniel J. Foster*, assigned counsel, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Matthew A. Crockett*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Timothy J. Quail, Sr., appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a, and larceny in the fifth degree in violation of General Statutes § 53a-125a. The defendant claims that the court improperly denied his motion to suppress physical evidence, including the results of forensic testing performed on such physical evidence, that the police seized during a warrantless search of his sister's residence. We affirm the judgment of conviction.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In December, 2009, the defendant was in a romantic relationship with the victim, Robin Cloutier. At or near that time, the defendant, who was unemployed, was not a licensed driver, and did not own an automobile, began residing with the victim at her apartment in Pomfret. Prior to the events underlying this appeal, the defendant expressed his desire to sell the victim's possessions without her permission. In a phone call to his son, which occurred while the victim was alive, the defendant conveyed that he had "things to sell," and wanted to meet with him on December 14, 2009.

In the evening hours of December 13, 2009, the defendant and the victim drove together in the victim's truck to the apartment of the defendant's sister, Theresa Quail, in Plainfield. The defendant and the victim spent a portion of the evening at Theresa Quail's apartment, where they socialized and consumed alcohol with Theresa Quail and her boyfriend. Theresa Quail's son, Jesse Cousineau, and his girlfriend also were present. Later that evening, the victim and the defendant, who had displayed anger toward the victim that evening, abruptly left in the victim's truck; they subsequently returned to the victim's apartment.

At some point after the defendant and the victim left Theresa Quail's apartment on December 13, 2009, but prior to the evening of December 14, 2009, the defendant struck the victim multiple times, both on her head and on other parts of her body, with a baseball bat. Using a knife, the defendant also stabbed the victim multiple times in her neck and torso. The physical assault occurred in the victim's bedroom, and the victim died as a result of the physical injuries inflicted by the defendant.[1]

At or about the time that the defendant caused the victim's death, he took possession of numerous items that belonged to the victim by removing them from her residence and putting them inside of her truck. These items included a leather jacket, a desktop computer, a television, several cable television receivers, a collection of foreign currency, a new video game console in its original packaging, and loose change. At some point

on December 14, 2009, the defendant left the victim's residence in her truck. At this point, the victim's cell phone had been turned off, the telephone at her apartment had been disconnected, her bedroom door was locked, the blinds in her apartment had been closed, and the doors to the apartment were locked. The defendant walked the victim's dog.[2] At or around noon on December 14, 2009, the defendant, driving the victim's truck alone, traveled to the residence of his mother, Gertrude Quail.

During the course of conversation, the defendant's mother inquired about the victim's whereabouts. Although the victim was unemployed at that time, and was collecting unemployment compensation benefits, the defendant replied that the victim was "working." The victim's mother expressed her belief that the victim had been laid off, but the defendant disagreed. The defendant also stated that he had to pick the victim up from work later that afternoon, at 5 p.m.

Later, on December 14, 2009, the defendant traveled in the victim's truck to a pawn shop in East Windsor. There, he sold the video game console, the desktop computer, and some of the foreign currency for $225. The owner of the pawn shop asked the defendant why he was selling a new, unopened video game console during the holiday season at the pawn shop. The defendant replied that he was separating from the person to whom he had intended to give it as a gift.

On that same day, the defendant drove alone to a gentleman's club in East Windsor. The defendant spent time at the bar inside of the club, and in front of a stage where a female dancer, whom he tipped well that day, was performing. A short time thereafter, the defendant spoke with the dancer outside of the club, and he used her cell phone. When the dancer was leaving the club for the day, the defendant removed the victim's leather jacket from the victim's truck and gave it to her.

The defendant contacted his son in an attempt to sell some of the other items that had belonged to the victim, telling his son that he was moving and that he needed money. Later, the defendant drove the victim's truck to Springfield, Massachusetts, where he abandoned it in a parking lot with empty tractor trailer trucks. The defendant abandoned the victim's television and cable television receivers in one of the empty trailers. The police did not retrieve the truck until December 23, 2009.

In the early morning hours of December 15, 2009, the defendant arrived at a Sunoco gas station in Springfield. The store manager at the gas station spoke with the defendant, who appeared to be intoxicated and edgy; the defendant told him that his truck had been towed and that he needed to make a telephone call. After he used a telephone at the store, the defendant instructed

the store manager to tell anyone who might call back that he would be at a nearby Mobil gas station. The defendant walked to the Mobil station and approached Michael Proulx, who was fueling his vehicle. The defendant asked Proulx if he could drive him to Enfield, and Proulx agreed. The defendant told Proulx that he had traveled to a liquor store in Massachusetts with his brother and his girlfriend, the police had towed his truck away while he was at the store, and his brother had been arrested. The defendant, who was carrying a backpack and appeared to be under the influence of drugs, told Proulx that his belongings were in the truck that had been towed away. Later that morning, Proulx left the defendant in Enfield, near the residence of the defendant's brother, Joel Quail. For several hours following his arrival at his brother's residence, the defendant hid inside a boat that was located in his brother's yard.

At approximately 11 a.m. on December 15, 2009, the defendant knocked on the door to his brother's residence, and was greeted by his brother. He told Joel Quail that he had been walking all night because the Springfield police had confiscated his truck after finding a large knife in it. Later that day, Joel Quail drove the defendant to Theresa Quail's apartment in Plainfield. They were met there by their older sister, Linda Quail, who also was residing at the apartment. The defendant, Linda Quail, and Joel Quail spent several hours together. Eventually, they were joined by Theresa Quail, Theresa Quail's boyfriend, Cousineau, Cousineau's girlfriend, and other acquaintances of Theresa Quail.

During a conversation between the defendant, Cousineau, and Linda Quail, the defendant stated that "he was going to be on the news and [despite] whatever they saw not to think differently of him." The defendant then hugged Cousineau. Cousineau asked the defendant about his relationship with the victim, but the defendant gestured that he did not want to talk about it. Shortly thereafter, Cousineau attempted to reach the victim by telephone, but he reached her voicemail.

Later during the evening of December 15, 2009, the defendant became involved in an argument with Theresa Quail and her boyfriend, and he was asked to leave Theresa Quail's residence. Before he left, Theresa Quail asked the defendant about the victim's whereabouts. The defendant replied that she was at work. After he left Theresa Quail's residence, the defendant went to the residence of one of Theresa Quail's neighbors, Todd Houston, who was also a friend of his. Houston was socializing with his girlfriend and another friend when the defendant arrived at his apartment. The defendant was in possession of several bottles of beer and a bottle of the prescription medicine Xanax that bore the victim's name. During the course of conversation, Houston inquired about the victim. In reply, the defendant stated

to Houston that the victim "[was] not doing too good," he and the victim had been in an argument, he "may or may not have hit her with a baseball bat," and the victim was dead. The defendant calmly yet tearfully related that he was with the victim, at her residence, when they observed a neighbor's dog outside. He stated that he and the victim brought the dog some type of straw bedding. Later, the neighbor who owned the dog arrived at the victim's apartment, armed with a gun. The defendant stated that he tried to calm the neighbor, but the defendant ultimately crawled to the bedroom, escaped from the apartment by means of a bedroom window, and crawled to the front of the apartment complex. He then stated "[s]omething to the effect that there was an argument and he may or may not have hit [the victim] with a baseball bat." Additionally, the defendant "said something to the effect that he was going to be on the news." Houston, believing that the defendant was joking about harming the victim, reacted to the defendant's statements by expressing his disbelief. Houston asked the defendant how he had arrived at his apartment, to which the defendant replied that he had hitchhiked, and that the victim's truck was "gone." Some of this conversation was overheard by Houston's girlfriend, Paula Peloquin, who overheard the defendant state his belief that he had struck the victim with a baseball bat. The defendant left Houston's apartment after approximately forty-five minutes.

After departing Houston's residence either in the late evening hours of December 15, 2009, or the early morning hours of December 16, 2009, the defendant ultimately returned to Theresa Quail's apartment. He fell asleep in Linda Quail's bedroom, which was unoccupied. In the early afternoon of December 16, 2009, Cousineau and several others entered the bedroom. They found the defendant, lying on the floor and clad in boxer shorts. He was wrapped in blankets and a towel, unresponsive, and struggling to breathe. Cousineau called 911. Emergency medical personnel arrived at the apartment and transported the defendant to a nearby hospital.

On December 16, 2009, the victim's father, Thomas Audrain, who believed that the victim feared the defendant, went to the victim's apartment twice, once in the morning and once in the late afternoon, after he learned from the victim's children that she had failed to pick them up from her former husband's home. Audrain observed that the victim's truck was not parked outside, and he did not observe any signs of forced entry into to the residence. He observed the victim's purse, wallet, and driver's license on the kitchen table therein. During his second visit to the residence in search of the victim, he used tools to forcibly open the victim's locked bedroom door.[3] He discovered the victim's lifeless body lying in a pool of blood on the bedroom floor. Audrain noticed evidence of a violent struggle in the bedroom,

a broken television was on the floor, and a bloody baseball bat[4] was on the victim's bed. Audrain sought help from a neighbor of the victim, who called 911, after he realized that the telephones in the victim's residence had been disconnected. On the basis of the evidence at the crime scene, the police determined that the victim's murder occurred in her bedroom.

On April 11, 2012, the state charged the defendant with committing murder and larceny in the fifth degree. Following a seven day trial, a jury found the defendant guilty of both charges. The court imposed a total effective sentence of sixty years of incarceration. This appeal followed.

With respect to the ruling at issue in this appeal, the following additional facts are relevant. At trial, the state offered in evidence the defendant's clothing and wallet that the police seized from Linda Quail's bedroom[5] in Theresa Quail's residence during a warrantless search on December 16, 2009, as well as the results of forensic tests that had been performed on these seized items. On April 18, 2012, which was the fourth day of the defendant's trial, the defendant moved to suppress all of these items. In the memorandum of law in support of the motion, the defendant argued, inter alia, that the seized items should have been suppressed because they were seized without a warrant, without probable cause, and outside of any exception to the warrant requirement. Furthermore, the defendant argued in his memorandum of law in support of the motion that the results of the subsequent search of the seized items should have been suppressed because the evidence yielded by such subsequent searches were fruits of the poisonous tree. The defendant argued that the police had seized items of personal property from an area in which he, as an overnight guest in the bedroom, had a reasonable expectation of privacy, and that the seizure occurred at a time when he was not present and, in fact, was unresponsive and incapable of consenting to the seizure. He argued in relevant part that no third party had consented to the seizure of the items, and that "[t]here was nothing about the seized items of personal property that indicated [that] they were associated with any crime against the alleged victim; nor did such indicator of criminality associated with the defendant's clothes appear in plain view. Even if the police were standing in a permissible area [of the residence searched], the mere sight of the items did not provide them probable cause to believe that these were the same clothes worn at the time of the killing of the alleged victim. The police acted not from probable cause or even reasonable suspicion, but rank speculation in seizing the defendant's property." On April 19, 2012, the court held a hearing on the motion to suppress.

At the suppression hearing, state police Sergeant John Turner testified in relevant part as follows. He

was the supervisor of the crime scene investigation at the victim's apartment on the night when her body was discovered, December 16, 2009. When he and other state police officers arrived at the victim's apartment on that night, they interviewed Audrain, who identified himself as the victim's father. After interviewing Audrain, the state police learned that the victim had a boyfriend, whom they later identified as the defendant, and that he had a sister, Theresa Quail, who lived in Plainfield. The state police contacted Plainfield police and asked them if they knew of anyone with the defendant's last name, to which the police responded that they were aware that a person with that last name, the defendant, had just been transported to Backus Hospital from Theresa Quail's apartment in the afternoon on December 16, 2009, and that he had been in an unconscious state. Turner then dispatched state police detectives Priscilla Vining and Daniel Cargill to Theresa Quail's apartment in order to interview any witnesses, to determine the circumstances surrounding the defendant's transport to the hospital, the nature of the defendant's relationship to the victim, and the whereabouts of the defendant in relation to the victim's death. Furthermore, Turner testified that Vining and Cargill returned to the victim's apartment shortly after midnight on December 17, 2009, and obtained statements from Linda and Theresa Quail, and collected evidence—the defendant's clothing and wallet—from Linda Quail's bedroom in Theresa Quail's apartment. Turner testified that when Vining and Cargill returned to the victim's apartment, he instructed them to turn over the defendant's clothing to the evidence officer "for use . . . in the investigation should it become necessary," which they ultimately did. Turner testified: "At this point in time there was . . . no real connection . . . with [the defendant] and the murder, but I certainly believe that if he did become a suspect later on that that clothing could be evidence in the future. Based on knowing what the [crime] scene looked like and how bloody it was, one . . . could certainly believe that there'd be blood on that clothing, whether visible or not."

Vining also testified in relevant part as follows at the April 19, 2012 suppression hearing. When she went to the victim's apartment on the night of December 16, 2009, she and other state police officers learned that the victim never arrived at her former husband's home to pick up her two children on that day, which was her scheduled day of the week to have custody of them. Furthermore, Vining testified that when she arrived at the victim's apartment, she learned that, several hours earlier, the defendant, with whom the victim had been living, had been transported, in an unconscious state, from Theresa Quail's Plainfield apartment to a hospital. State police then searched a database for the defendant and determined that he was a registered sex offender and that he had been arrested multiple times in the past

for violent and drug-related crimes. Vining testified that, pursuant to Turner's orders, she and Cargill went to Theresa Quail's apartment at approximately 10 p.m. that night. Theresa Quail invited them inside the apartment when they arrived, and she and Cargill interviewed Linda Quail and Theresa Quail. Vining testified that Linda Quail, who had been living in Theresa Quail's apartment, then led her and Cargill up to her bedroom after the interview.[6] Linda Quail's bedroom was cluttered with clothing and household items. There was no indication that the defendant lived in that room but Linda Quail told her and Cargill that some clothing on the bedroom floor belonged to the defendant, specifically a denim jacket, a pair of blue jeans, a pair of socks, and a pair of sneakers.[7] Vining testified that blood was not visible on the clothing, but based upon her training and experience, the perpetrator of a crime such as the crime against the victim probably would have had blood on their clothing, so she seized it.

On April 20, 2012, the court issued an oral decision from the bench denying the defendant's motion to suppress. It stated: "Having heard the evidence that was adduced yesterday . . . the court finds that the collective knowledge of the state police at the time that . . . Vining and . . . Cargill arrived at [Theresa Quail's apartment], which was sometime around [10 p.m.] that night, indicates that there was no evidence of forced entry to [the victim's] apartment . . . that it was an extremely bloody scene so that there was likely transfer of blood to any perpetrator's clothing; the state police found a baseball bat which was probably at least one of the instruments used in committing the crime and that type of instrument would, of course, cause blood spattering. And it was very obvious from the photographs and from anybody that looked at the bat that it had blood like stains contained on it.

"The evidence also shows that the defendant had been living with [the victim], but was not present at the apartment at the time that her body was discovered. The state police also knew that the defendant was a registered sex offender and had numerous arrests for violent crimes in the past. The state police, learning from . . . Audrain that the defendant was [the victim's] boyfriend, called the Plainfield police, who indicated to them that the defendant had been taken by ambulance to Backus Hospital approximately [three] hours earlier because of either an extreme intoxication and/or a drug overdose.

"Although all civilian witnesses that have testified in this case indicate that the last time that [the victim] was seen alive on, I believe, Sunday, December [13, 2009] this information was not known to the state police at the time that they went to [Theresa Quail's apartment], therefore they could have reasonably assumed that [the victim] was killed on December [16, 2009]

when the body was discovered.

"The testimony at the hearing further shows that Detectives Vining and Cargill went to [Theresa Quail's apartment] in Plainfield; that they knocked on the door; that they identified themselves to the person who answered the door and explained why they were there; that they asked who the name of the person who had answered the door and that woman indicated she was . . . Theresa Quail; that the detectives explained to Theresa Quail and also Linda Quail why they were there and after further discussions . . . Cargill with Linda Quail and . . . Vining with [Theresa] Quail . . . Vining and Cargill and Linda Quail went up to Linda Quail's bedroom which was on the second floor at the top of the stairs.

"The testimony indicated that Linda Quail led the state police up there. Entering the room . . . Vining observed the room to have on the floor certain items including a mattress, a lot of clothing—female clothing primarily—as well as household items. Linda Quail also indicated that certain clothing on the floor belonged to the defendant.

"Based upon the fact that the crime scene was very bloody and that a baseball bat at a minimum was involved . . . Vining knew from her training and experience that any perpetrator would likely have blood spatter and/or transfers on his clothing; therefore . . . Vining seized that clothing as potential evidence.

"The court finds that the state police were lawfully in Linda Quail's bedroom based on Linda Quail's consent to allow them into her room. The testimony indicates that while downstairs the state police explained to Linda Quail why they were at [Theresa Quail's apartment] and that Linda Quail voluntarily thereafter led them upstairs.

"At the hearing, there was not a scintilla of evidence adduced indicating that Linda Quail was forced, threatened, or coerced into bringing the state police upstairs to her bedroom. The state need only prove the lawfulness of a search and seizure by a preponderance of the evidence. Although in this case the evidence of consent is not overwhelming, there is no evidence which demonstrates that Linda Quail did not really consent.

"Accordingly, on this record, the court finds that Linda Quail did consent to a search of her bedroom. Once in the bedroom, Linda Quail pointed out clothing that belonged to the defendant. The court finds that that testimony was not hearsay, in that it was introduced to show the effect on the hearer and to explain why . . . Vining would seize the clothing that she did.

"The clothing that was seized was seized in plain view on the floor of the room and upon seeing it, it was immediately apparent to . . . Vining, based on her

training and experience and in light of the bloody crime scene that she had observed, that this clothing was potentially incriminatory.

"Moreover, this evidence—in other words, the clothing—is of a type that, if not seized at that time because of its location and mobility, it could have been lost, stolen, destroyed or in some way tampered with.

"Therefore, for all of the foregoing reasons, the court finds that the state police lawfully seized the defendant's clothing from the bedroom of Linda Quail on December 16 and 17, 2009; therefore, the court denies the defendant's motion to suppress."[8]

On April 24, 2012, which was the next day on which trial proceedings took place, the court once again took up the matter of the defendant's motion to suppress, at which point it stated the following: "Okay. So let me put the following additional [statements] on the record. And it amplifies, I guess, the decision that I rendered last Friday on the motion to suppress. The defense did raise a *Crawford* v. *Washington* [supra, 541 U.S. 36] issue with respect to the motion to suppress and rightly indicated that there is—[that is] a case of first impression here in Connecticut. In this court's opinion, there is no *Crawford* v. *Washington* issue, so I [do not] need to rule on that with respect to this particular case.

"Number one, the state did not offer any statements of Linda Quail to prove consent to search or seize. And, secondly, the sole statement of Linda Quail offered by the state was her statement—[Linda Quail's] statement that certain clothing in the room belonged to the defendant. And as [I have] already indicated previously, that was not hearsay because it was offered to show the effect on the hearer. In other words, why . . . Vining seized the clothing that she did.

"All right. With respect to that clothing, the court has previously determined that the clothing was immediately apparent to . . . Vining, as likely containing evidence of the crime of murder. The court has also previously found that the—at [10 p.m.] on December 16, 2009, the state police reasonably believed that the murder had occurred on December 16, 2009, the day that the body was found. Stated differently, they had no reason to believe that the murder did not occur on . . . December 16, 2009.

"The court failed to state [in its earlier decision on the motion to suppress] that because the state police were only called to the crime scene on December 16, it was reasonable for them to conclude that the murder took place on December 16, and thus also it was reasonable for them to conclude that the defendant had been wearing the clothing found in Linda Quail's bedroom at the time of the murder, or on December 16, 2009.

"And the final loose end with respect to the suppression hearing, is that in the motion to suppress, in addi-

tion to moving that the defendant's clothing be suppressed, the defendant has also moved that the results of any testing of the clothing be suppressed. The state counters [that] the testing was conducted after the state police obtained a [warrant pursuant to *State* v. *Joyce*, 229 Conn. 10, 639 A.2d 1007 (1994) (*Joyce* warrant)]. The defense does not contest the validity of the *Joyce* warrant, but rather argues that the results of any testing should be suppressed as the fruit of the initial poisonous warrantless [seizure] of the clothing.

"As an aside, the court does take judicial notice that a *Joyce* warrant was issued for the blue jeans, sneakers, socks, and shirt on June 14, 2011. That warrant authorized the forensic science lab[oratory] to test the defendant's clothing for the presence of evidence of the crime of murder. The court's understanding from argument here is that the test results [that] the state intends to introduce were obtained by the lab[oratory] after June 14, 2011; thus, the tests were conducted in accordance and under the authority of the [*Joyce*] warrant.

"The court has previously found that the warrantless seizure of the defendant's clothing was not unlawful; therefore, the court now extends that reasoning to find that the test results obtained were not the result of the fruit of any poisonous tree or any illegal warrantless seizure of the clothing. Accordingly, the court also denies the defendant's motion to suppress the test results."

After the court issued its decision denying the defendant's motion to suppress, the state presented, inter alia, the following evidence: the defendant's clothing and wallet that were seized from Linda Quail's bedroom; the results of DNA and forensic tests performed on those items pursuant to the *Joyce* warrant, which testing revealed that the defendant's shirt and blue jeans contained blood like stains that tested positive for the victim's DNA; and Vining's testimony about her and Cargill's visit to Theresa Quail's apartment on the night of December 16, 2009.

Before this court, the defendant does not contest that Theresa Quail, as a co-occupant of the bedroom, validly consented to the police *search* of the bedroom in which he had been an overnight guest prior to the time at which he was transported to the hospital on December 16, 2009. Relying on arguments that he advanced before the trial court, the defendant challenges the court's denial of his motion to suppress on the ground that the warrantless *seizure* of his clothing and personal effects from the bedroom at Theresa Quail's residence violated his rights under the fourth amendment to the United States constitution.[9] The defendant argues that Linda Quail did not consent to the seizure of his clothing and personal effects and that even if she had done so, such consent was invalid because she did not have the authority to so consent.[10] The state argues, in essence,

that the seizure of the defendant's items by the police, which occurred after the defendant had been transported to the hospital in an unconscious state, was lawful because it occurred "pursuant to valid consent" by Theresa Quail, and any subsequent testing of the items occurred pursuant to a *Joyce* warrant. Alternatively, relying on the other evidence presented at trial, the state argues that any error in the denial of the defendant's motion to suppress and subsequent admission of the evidence at issue was harmless beyond a reasonable doubt.

"It is well settled that constitutional search and seizure violations are not structural improprieties requiring reversal, but rather, are subject to harmless error analysis. . . . Accordingly, we often have declined to decide fourth amendment issues attendant to the legality of a search or seizure when it is clear that any erroneous admission into evidence of the fruits of the search was harmless beyond a reasonable doubt. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt . . . [but] the state bears the burden of proving that the error was harmless . . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . .

"Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] . . . and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . The state bears the burden of proving that the error is harmless beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 156 Conn. App. 537, 560–62, 113 A.3d 103, cert. denied, 317 Conn. 910, 115 A.3d 1106 (2015). To the extent that we may dispose of the appeal on the ground of harmless error, without having to

resolve the fourth amendment claim raised by the parties, it is consistent with our jurisprudence that we do so. See *Moore* v. *McNamara*, 201 Conn. 16, 20, 513 A.2d 660 (1986) ("[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case").

We carefully have discussed the facts that the jury reasonably could have found on the basis of the evidence presented at trial. In the present case, there was ample and compelling circumstantial evidence that demonstrated the defendant's guilt. We have repeatedly acknowledged that "it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 330, 929 A.2d 278 (2007).

The state presented evidence that the defendant, who was living at the victim's residence and who accompanied the victim home on the night of her murder, had ample opportunity to murder the victim. The evidence concerning the crime scene and the steps taken by the assailant to conceal the victim's death, such as disconnecting the victim's phone and locking doors in her residence, suggested that the victim was murdered by someone, like the defendant, who had access to her residence and was known by the victim. There was evidence that, like the defendant, the victim's assailant was a smoker and that the assailant had smoked in the victim's bedroom.

The state presented evidence that the defendant had a motive to kill the victim. In the days prior to her death, the defendant, who was unemployed, expressed his interest in selling the victim's belongings without her knowledge. On the night of the victim's murder, the defendant quarreled with the victim. There was evidence that immediately following the victim's murder, the defendant took possession of the victim's truck and other items belonging to the victim, and that he sold many of these items. There was evidence that the defendant either discarded or gave away other items belonging to the victim, behavior that strongly suggested that he knew that the victim no longer would have a need for these possessions.

The state presented evidence that the defendant was conscious of his guilt and had attempted to avoid detection for his involvement in the victim's death. There was compelling evidence that the defendant made several false statements concerning the victim's whereabouts following her murder. Among these statements, he stated to his mother that he had to pick the victim up from a job that she did not have. The defendant also made false and conflicting statements to others with

respect to the victim's truck and his activities in Spring-field. Additionally, it sheds light on the defendant's state of mind that, after a tire on the victim's truck deflated, he simply abandoned the truck in Springfield. He neither called the victim to tell her what had occurred nor sought her assistance in returning to Connecticut. In addition to this conduct, the evidence demonstrated that, upon arriving at his brother's residence in Enfield on the morning of December 15, 2009, the defendant hid for several hours in a boat that was stored on his brother's property, an unusual act that undoubtedly shed light on his continued effort to conceal himself and his whereabouts.

Most compelling, however, was the evidence that, prior to the time at which the victim was discovered dead in her residence, the defendant essentially confessed to the victim's murder. "[C]onfessions have a particularly profound impact on the jury, so much so that we may justifiably doubt [the jury's] ability to put them out of mind even if told to do so." (Internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 581, 46 A.3d 126 (2012). Houston unambiguously testified that the defendant told him the tale about a visit from the victim's angry neighbor and, subsequently, that he himself had struck the victim with a baseball bat (one of the murder weapons in the present case), and that he believed her to be dead. Houston's girlfriend, Peloquin, testified that she recalled Houston asking the defendant about the victim. Peloquin stated that the defendant replied: "I think I hit her with a bat." Peloquin testified that the defendant told a story about an angry neighbor who owned a dog and his having crawled out of the house through a window. Peloquin added that, later that evening, the defendant started crying.

It adds to their probative value that these highly incriminatory statements were made by the defendant, while he was emotional, to a friend. Prior to telling this chilling version of events, and prior to the discovery of the victim's body, the defendant made statements to Cousineau and his sister, Linda Quail, which conveyed that the defendant would be "on the news," and that they should not think any differently of him. Plainly, these statements reflected the defendant's awareness that he soon would be the subject of media attention for something that would tend to make his family members think poorly of him. These statements, viewed in conjunction with the other evidence presented in this case, was independent and overwhelming evidence of the defendant's guilt.[11]

Additionally, the DNA evidence from the clothing discovered during the police search of the bedroom was not the only evidence of a forensic nature that linked the defendant to the victim's murder. The state presented evidence that the defendant could not be eliminated as a contributor to the DNA collected from

the grip of the bloody baseball bat found at the crime scene. The state presented evidence that the defendant was a contributor to DNA collected from the inside neck and shoulder area of a shirt that was found at the crime scene and the blood like stains on the shirt contained the DNA of the victim.

We recognize, as the defendant argues, that in particular criminal convictions, DNA evidence may be the most compelling evidence of an accused's guilt. See, e.g., *State* v. *Smith*, 280 Conn. 285, 309, 907 A.2d 73 (2006). In the present case, however, the result of the forensic testing performed on the clothing that was discovered by the police in the defendant's bedroom was, by far, not the most compelling evidence of his guilt. There was other forensic evidence that tied the defendant to the crime scene, where he resided with the victim, including forensic evidence that suggested that the defendant had used the murder weapon. Apart from forensic evidence, however, was the ample evidence of the defendant's admissions of involvement in the victim's death, the defendant's false statements concerning the victim's whereabouts following the murder, his motive to kill the victim, his conduct with respect to items that he took from the victim's residence following her death, his hiding in a boat following her death, and his contradictory and false statements concerning his activities following her death.

Against this evidentiary backdrop, we conclude that the state has succeeded in demonstrating that it presented overwhelming evidence of guilt independent of the evidence at issue in the present claim.[12] Additionally, the state has demonstrated that, in light of the strength of the state's case, the evidence at issue in the present claim cannot reasonably be viewed as having impacted the result of the trial. Thus, even if the court improperly denied the motion to suppress, we conclude that such denial was harmless error in the present case.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] There was evidence that, following the violent incident that led to the victim's death, a shirt had been placed on the victim's bed and that a cigarette had been smoked in the victim's bedroom.

[2] One of the victim's neighbors, Corri Degray, last saw the victim on either December 12 or 13, 2009, and observed the defendant walking the victim's dog on the morning of December 14, 2009.

[3] The state presented evidence with respect to a shirt with blood like stains that was found in the victim's living room. Nicholas Yang, a forensic examiner, testified that the blood like stains on the shirt revealed the presence of the victim's DNA and that the defendant was a contributor to DNA samples collected from the inside neck and shoulder seams of the shirt.

[4] The results of DNA tests performed on the bat, which were presented at trial, reflected that the defendant's DNA could not be eliminated as a contributor in a test of the bat's grip. One of the victim's neighbors, Ellen Silva, testified that she occasionally saw the victim and the defendant sitting outside of the victim's apartment and that, on at least one occasion, she observed the defendant using a baseball bat to hit a ball for the victim's dog to fetch. Also, Silva testified that, on December 14 and 15, 2009, she heard the victim's dog whining in the victim's apartment.

[5] As set forth in our earlier recitation of the facts, during the late evening

hours of December 15, 2009, or the early morning hours of December 16, 2009, the defendant returned to Theresa Quail's residence and slept in the bedroom, which was unoccupied at the time. Cousineau and others found the defendant in the bedroom in the early afternoon of December 16, 2009.

[6] At this point in Vining's testimony at the suppression hearing, defense counsel objected to any testimony with respect to Linda or Theresa Quail's consent to the police searching Linda Quail's bedroom. Defense counsel also asked the court to extend the reasoning of *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2008), and *Davis* v. *Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), to the admissibility of consent. Specifically, defense counsel argued: "Since this is a threshold hearing, which is more than likely going to be dispositive of the whole case, we think those elements which have been addressed in *Crawford* certainly should extend to a suppression hearing with such dramatic results, depending on how the court rules. For those reasons, the official objection is to any testimonial hearsay regarding the issue of consent that came out of the mouth of anyone who's not here to testify."

In response, the state argued, in relevant part: "Anything that Detective Vining testifies to as to what the occupants of the house told her is offered not for the truth of the matter, but for the effect on the [hearer] and what the officer did as it relates to the subject of what it is that the defendant wants to suppress. This is not—what she's testifying to is not testimonial and *Crawford* [does not] apply." The court overruled defense counsel's objection.

[7] There were also items in the pockets of the clothing, including a wallet, a nail clipper, and a toothbrush. At the suppression hearing, defense counsel indicated that they were not seeking to suppress the sneakers and the socks collected from Linda Quail's bedroom, but that they were only seeking to suppress the pants, the shirt, and the wallet.

[8] Pursuant to Practice Book § 64-1, the court subsequently signed a transcript of its oral decision and filed it with the clerk of the trial court.

[9] In his brief, the defendant also cites to article first, § 7, of the Connecticut constitution, but has not adequately analyzed a claim thereunder.

[10] In support of his claim, the defendant relies, inter alia, on *Arizona* v. *Hicks*, 480 U.S. 321, 327, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987), *United States* v. *Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974), and *State* v. *Edwards*, 214 Conn. 57, 75, 570 A.2d 193 (1990).

[11] In addition to presenting evidence of these statements made by the defendant prior to the time that the victim's body was discovered, the state presented evidence that, on May 15, 2010, while he was incarcerated, he spoke on the telephone with his son. The defendant asked if there was any news about the investigation of the victim's murder. His son replied that there was a story in the news in which the defendant was reported to have told one of Theresa Quail's neighbors, on the night before the defendant was transported to the hospital, that he had killed the victim with a baseball bat. Rather than stating that he did not kill the victim, the defendant essentially replied that this conversation had occurred, but that the events described therein were untrue.

Furthermore, the state presented evidence that, in a telephone conversation that took place on March 13, 2010, while the defendant was incarcerated but prior to the forensic testing of the clothing seized from his bedroom at Linda Quail's residence, the defendant stated to his brother that there was no blood on his clothing or the victim's truck.

[12] Consistent with our analysis of the evidence presented by the state, we observe that the evidence related to the clothing seized from Theresa Quail's residence was not a prominent feature of the prosecutor's closing argument to the jury. During the state's initial closing argument, the prosecutor once referred, in general, to the "forensic science evidence" in this case. During the state's rebuttal closing argument, the prosecutor discussed the ample circumstantial evidence that supported a finding of guilt and, only at the end of her argument, referred to the evidence that the victim's blood had been found on the clothing seized by the police as "one last piece of the puzzle" that demonstrated the defendant's guilt.